# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 372 | **DATE** | 11/5/2004 |
| **CASE TITLE** | Steven Manning vs. Thomas Dye, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendants' motion (134-1) for summary judgment is granted in part and denied in part. Plaintiff's motion to strike (147-1) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | **NOV 0 9 2004** | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | GMA | 155 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GL | courtroom deputy's initials | 2004 NOV -9 AM 9:22 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

STEVEN MANNING,               )
                              )
        Plaintiff,            )
                              )
    vs.                       )        Case No. 02 C 372
                              )
THOMAS DYE; ROBERT BUCHAN;    )
GARY MILLER; JOHN O'ROURKE;   )
and UNITED STATES OF AMERICA, )
                              )
        Defendants.           )

**DOCKETED**

NOV 0 9 2004

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

For a brief period in 1986, plaintiff Steven Manning, a former Chicago police officer, cooperated with the Federal Bureau of Investigation in a criminal investigation. He had contact with FBI Special Agent John O'Rourke, who was assigned to the Chicago FBI's office's "Squad 9," and helped make a case against two of his associates, Thomas McKillip and Anthony Mammolito. Manning contends that O'Rourke pressed him to become a FBI informant, but he declined, ending his relationship with the Bureau later that year. He says that O'Rourke reacted negatively to this and resolved to retaliate against him. In 1987, Manning filed a lawsuit against the FBI, O'Rourke, and other members of Squad 9, alleging they were improperly manipulating informants to falsely implicate him in criminal activity (the suit was dismissed shortly after its filing).

In 1988, at the urging of O'Rourke, Squad 9 opened an investigation of Manning, who was suspected of involvement in ongoing criminal activity. Agent Robert Buchan was assigned

155

to be the case agent for the investigation. In the interim, Thomas McKillip had been found murdered in Buffalo Grove, Illinois. Buchan contacted Buffalo Grove police detective Robert Quid, who had responsibility for the McKillip homicide investigation, and he ultimately enlisted Quid's assistance and cooperation in the FBI's investigation of Manning. Quid's work on the investigation ended up going far beyond the McKillip homicide.

In July 1990, the investigation of Manning struck pay dirt. Largely as a result of information from Anthony Mammolito, another Manning associate who was in prison in Louisiana, Manning was charged in Missouri state court with the 1984 kidnapping of Charles Ford, a drug dealer, and Mark Harris, a friend of Ford. Mammolito's cooperation was secured through detective Quid's efforts, and the investigation that led to the Missouri charge had been conducted in significant part by Buchan and Quid.

After he was charged in Missouri, Manning was arrested in Illinois on a Missouri warrant and was detained at the Cook County Jail while awaiting extradition. Defendants claim the FBI received information from an informant that Manning might be a threat to witnesses against him in the Missouri case. In addition, Manning was suspected of involvement in the disappearance of Jimmy Pellegrino, a former associate of his. While Manning was at the Jail, the FBI, in cooperation with local authorities, arranged for him to be placed in a cell with Thomas Dye, a jail house informant, in the hope of obtaining evidence to be used against Manning. Dye had recently been given a lengthy prison sentence for burglary and was awaiting trial on theft and robbery charges.

Gary Miller, another FBI agent with Squad 9, was given responsibility for working with Dye. He allegedly told Dye to avoid eliciting information from Manning about the Missouri

2

kidnapping, with which Manning had already been charged. But Dye proceeded to do exactly that. He later testified that during the period they were jailed together, Manning asked him to provide a false alibi in the Missouri case and in return promised to arrange for the main witness against Dye to be killed. Following Manning's conversations with Dye, the FBI worked with Dye's girlfriend, Sylvia Herrera, to elicit information from Manning about the false alibi.

Dye also claimed that during their jail house conversations, Manning told him that he had killed Jimmy Pellegrino, with whom he had been in business, because Pellegrino had threatened to turn him in to the police. Dye was fitted with a body recorder for the purpose of recording two conversations with Manning in August and September 1990. Both conversations included discussions of how Dye and Manning would help each other in their pending cases. Much later, Dye also claimed that in both conversations, Manning admitted killing Pellegrino. However, no such references appeared on the tape recordings, and no reference to Pellegrino appeared in Miller's debriefing memorandum prepared after the first conversation. Dye ultimately claimed that the admission came during a two-second inaudible gap in the first recording. The recorder had evidently malfunctioned during the second conversation, though there may be reason to believe that Dye switched the recorder off.

Largely on the strength of Dye's claims, Manning was charged with Pellegrino's murder in Illinois state court in February 1992. In the interim, he was taken to Missouri to stand trial on the kidnapping charges. Manning was tried in October 1991, but the jury deadlocked, and a mistrial was declared. On retrial in January 1992, he was convicted and was given a sentence of life in prison. Anthony Mammolito, a prison inmate and alleged accomplice of Manning whose cooperation had been secured by detective Quid acting at agent Buchan's behest, testified at both

3

trials regarding Manning's participation in the kidnapping. Among other things, Mammolito identified Manning as having picked up the ransom – though he had originally told Quid that he himself, with McKillip, had performed that task. At the second trial, Sylvia Herrera testified about the alleged plan to fabricate an alibi defense. Carolyn Heldenbrand, the sister of one of the kidnapping victims, also testified, identifying Manning as the person she had seen during the ransom drop. Heldenbrand claimed to have picked Manning from a photographic line-up in 1990 conducted by Buchan.

Manning was returned to Illinois for trial on the Pellegrino murder. Dye testified at the trial regarding Manning's purported admissions to the murder and their conversations about assisting each other in their pending cases. Manning was convicted of the murder and sentenced to death.

In April 1998, Manning's murder conviction was reversed by the Illinois Supreme Court, and the case was remanded for a new trial, due to the erroneous admission of hearsay consisting of a purported statement by the murder victim to his wife and the erroneous admission of evidence regarding conversations between Dye and Manning regarding their other pending cases. *People v. Manning*, 182 Ill. 2d 193, 695 N.E.2d 423 (1998). Following the reversal, Cook County prosecutors determined not to pursue Manning further and dropped the case.

In January 2002, Manning filed this suit against FBI agents Robert Buchan and Gary Miller, the United States, Thomas Dye, Chicago Police detective Louis Rabbit, and the City of Chicago, alleging that they had framed him for the Pellegrino murder and had violated his constitutional rights and committed various torts. After the Court denied a motion by the federal defendants seeking dismissal on immunity and other grounds, *see Manning v. Dye*, No. 02 C 372,

4

2003 WL 145423 (N.D. Ill. Jan. 21, 2003), Buchan and Miller took an interlocutory appeal, arguing that they were entitled to absolute or qualified immunity. The Seventh Circuit rejected their contentions. *Manning v. Miller,* 355 F.3d 1028 (7th Cir. 2003).

In November 2002, the United States Court of Appeals for the Eighth Circuit ruled that the government's use of informants against Manning after he was charged with the Missouri kidnapping and represented by counsel violated his Sixth Amendment rights and that Sylvia Herrera's testimony should have been excluded from evidence in that case. The court granted a writ of habeas corpus, directing Missouri to release Manning unless it retried him. *Manning v. Bowersox,* 310 F.3d 571 (8th Cir. 2002). The Missouri authorities declined to do so, and Manning was released from prison. Manning then amended his complaint in this case to include claims that his constitutional rights had been violated by Miller, Buchan, FBI Agent John O'Rourke, and Buffalo Grove detective Quid in the course of obtaining the Missouri conviction. He also named the United States under the Federal Tort Claims Act as well as the Village of Buffalo Grove.

Manning has since dismissed as defendants Rabbit, Quid, the City of Chicago, and the Village of Buffalo Grove, leaving the three FBI agents, Dye, and the United States. At present, Manning's remaining claims are as follows:

| Count | Defendants | Nature of claim |
| --- | --- | --- |
| Count 1 | Buchan, Miller | Claim under *Bivens* - Illinois murder |
| Count 2 | Dye | Malicious prosecution - Illinois murder |
| Count 3 | United States | FTCA - malicious prosecution - Illinois murder |

5

| Count 5 | Miller, Buchan | 42 U.S.C. § 1983 - conspiracy - Illinois murder and Missouri kidnapping |
| Count 6 | Miller, Buchan, Dye | 42 U.S.C. § 1983 - Illinois murder |
| Count 7 | Buchan, Miller, O'Rourke, Dye | Claim under *Bivens* - Missouri kidnapping |
| Count 8 | Dye | Malicious prosecution - Missouri kidnapping |
| Count 9 | United States | FTCA - malicious prosecution - Missouri kidnapping |
| Count 10 | Miller & Buchan | 42 U.S.C. § 1983 - Missouri kidnapping |
| Count 11 | Buchan, Miller, O'Rourke, Dye | RICO - Illinois murder and Missouri kidnapping |
| Count 12 | Buchan, Miller, O'Rourke, Dye | RICO conspiracy - Illinois murder and Missouri kidnapping |
| Count 13 | United States | FTCA - intentional infliction of emotional distress - Missouri kidnapping |

The federal defendants – in other words, all the remaining defendants but Dye – have moved for summary judgment on Manning's claims. In his response to the motion, Manning states that he has no objection to entry of summary judgment in favor of O'Rourke. *See* Pltf. Resp. at 3 n.1. The Court will therefore address only the claims against Buchan, Miller, and the United States that are contained in Counts 1, 3, 5, 6, 7, 9, 10, 11, 12, and 13.

### Discussion

The facts in this case are sharply disputed, and it is anything but clear whether a fact finder would, after seeing and hearing the witnesses, find the facts as Manning presents them. But that is not for the Court to decide in the present context. A summary judgment motion is not a trial-by-paper in which the court reviews all the evidence, determines which side's version is

6

more likely, and rules accordingly. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). On the contrary, a court addressing a summary judgment motion may not weigh the

evidence, decide which competing inferences are more likely, or make credibility determinations.

*See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *Continental Cas. Co. v. Anderson*

*Excavating & Wrecking Co.*, 189 F.3d 512, 520 (7th Cir. 1999). Rather, we must take the facts,

and the inferences reasonably drawn from them, in the light most favorable to the non-moving

party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

*Morfin v. City of East Chicago*, 349 F.3d 989, 996-97 (7th Cir. 2003).

**A.     Section 1983 claims (Counts 5, 6 & 10)**

In Counts 5, 6, and 10, Manning asserts claims against Buchan and Miller under 42

U.S.C. § 1983. Defendants argue that they cannot be held liable under section 1983, as that

provision requires action under color of *state* law, whereas they acted under color of *federal* law.

We have scoured Manning's brief and have found no response on this point. Though it could be

maintained that the evidence of the FBI agents' actions in concert with Buffalo Grove detective

Quid, who is no longer a defendant, might suffice to permit them to be held liable under § 1983,

the Court takes Manning's failure to address the point as a concession that summary judgment is

appropriate on the § 1983 claims. The Court therefore grants summary judgment in favor of

Buchan and Miller on Counts 5, 6, and 10.

**B.     *Bivens* claims (Counts 1 & 7)**

Manning's claims against agents Buchan and Miller are made pursuant to *Bivens v. Six*

*Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which

permits a person whose constitutional rights were violated by a federal law enforcement agent to

7

sue for damages. On Buchan and Miller's interlocutory appeal, the Seventh Circuit said that Manning could pursue a claim based on the defendants "creating false evidence" used to convict Manning of a crime. *Manning v. Miller*, 355 F.3d at 1033. Manning's claims largely are brought under that rubric.

### 1.     Illinois murder case

A fact finder reasonably could find that Buchan and Miller, acting in concert with each other and with others, created false evidence that was essential in convicting Manning of the Pellegrino murder and withheld knowledge of this from prosecutors in the case.

To begin with, a fact finder could find that the defendants had a motive to try to make a case or cases on Manning to get him off the streets. The motive might have been laudable on its face – their concern that Manning posed to danger to society or to particular individuals – or might have been nefarious one – to show him what happens when informants do not play ball. The nature of the motive, however, is of no consequence to the Court's current inquiry. The significant point is that there is evidence to support a finding that defendants had a reason to try to put together a case against Manning.

A fact finder reasonably could find that the defendants engaged in an effort to find and recruit someone at the Cook County Jail who could be used as an informant against Manning. This effort led them to Dye, who, they learned, was a "con man" with a "notorious reputation for scamming people" who "could not be trusted on word and actions alone," *see* Pltf. LR 56.1(b)(3) Stmt. ¶ 97, and who was, as Manning's counsel puts it, "a pliable witness for hire."

Miller met with Dye and obtained his agreement to act as an informant. Arrangements were made to position Dye within the Cook County Jail so that he would have ready access to

Manning. Miller began to have regular contact with Dye. Dye thereafter advised Miller that Manning had made admissions to him regarding a variety of crimes. But Manning has denied doing so, *see, e.g.,* Manning Dep. 133-40, and for present purposes the Court must conclude that a reasonable fact finder could determine that Dye was making it up.

Eventually defendant Miller arranged for Dye to be fitted with a recording device, and Dye attempted to record two conversations with Manning in August and September 1990. A fact finder reasonably could believe Manning's testimony that he made no admissions about the Pellegrino murder to Dye during these conversations.

Though Dye later claimed that during the August 24 conversation, Manning admitted killing Pellegrino, a fact finder reasonably could find that the defendants knew this was untrue. The tape of that conversation contained no reference to Pellegrino at all, let alone to killing him. The memorandum prepared by Miller when he debriefed Dye after that conversation included no reference to Pellegrino. The purported admission "surfaced" only later, during one of a series of as many as twenty sessions that Miller had with Dye listening to the tape recordings. Dye purportedly claimed during one of those sessions that Manning had made the admission during a two-second gap on the recording.

It is possible that a fact finder, after hearing all the evidence, might conclude that Dye made up the admission on his own, without the defendants helping or even knowing. But a fact finder also reasonably could conclude that he was importuned by Miller, by suggestion or otherwise, to fabricate evidence against Manning generally and/or to fabricate this admission specifically. Miller reasonably could be found to have had both a motive to plant the fabrication with Dye, or at least conceal his awareness of Dye's fabrication, as well as an extended

opportunity to do so. When one puts this together with the inferences that reasonably could be drawn from the emergence of the Pellegrino admission only after extended contacts with Miller, and the fact that Dye later came up with details about the killing that could only have come from investigators or the killer (Manning says he had no such details and did not give them to Dye), it adds up to a permissible inference that Miller induced Dye to fabricate the purported admission or assisted Dye in doing so. In a recent deposition, Dye testified he was coached by Miller and Buchan, though he claimed his privilege against self-incrimination on the question of whether his trial testimony was untrue (an invocation that we do not take as evidence against Miller or Buchan).

The defendants, who deny that Dye was influenced, do not claim that they advised the prosecutors in the Illinois murder case that Dye's statements had been fabricated. At various intervals, defendants appear to want to characterize Manning's claim as a *Brady v. Maryland* claim in its very simplest sense: non-disclosure of certain monetary inducements that Manning has now uncovered that may have been given or promised before the Illinois trial but were, allegedly, not disclosed. Were this all that Manning's claim concerned, the Court might well agree with defendants that this particular non-disclosure, standing alone, is immaterial and thus not a violation of *Brady*. But this is too crabbed a characterization of Manning's claim. The claim, once again, is that the defendants fabricated the key evidence against Manning and then concealed this fact from prosecutors and Manning's defense at the trial. The supposedly undisclosed inducements may be part of the entire scenario to be presented at trial, but they are, largely, part of the background music.

A reasonable fact finder also could conclude that the defendants' fabrication of the Dye

10

evidence, and the non-disclosure of that purported fact, were material. It is certainly true that Manning's defense counsel had a significant amount of ammunition to use on cross-examination of Dye at trial. But all of it pales by comparison with what counsel would have had if the defendants had disclosed that they, together with Dye, had cooked up the evidence. Indeed, had that been disclosed, it is likely the case against Manning could not have proceeded, let alone succeeded; later statements by the Illinois prosecutor in charge of the case tend to show as much.

For these reasons, the defendants are not entitled to summary judgment on Count 1 as to the merits of Manning's claim for violation of his constitutional rights in connection with the Illinois murder prosecution.

## 2. Illinois murder case - defense of immunity

Defendants also argue that they are entitled to absolute or qualified immunity on this claim. First, they argue that Manning is barred by the doctrine of absolute immunity from bringing a claim against them for perjury or conspiracy to commit perjury. *See generally Briscoe v. LaHue,* 460 U.S. 325, 331-32 (1983); *House v. Belford,* 956 F.2d 711, 720 (7th Cir. 1992). But that is not the thrust of Manning's claim. Rather, the Court understands Manning to be advancing the type of claim that the Seventh Circuit said in *Manning v. Miller* he could assert without running afoul of absolute immunity: a claim that the defendants created false evidence and then withheld that fact from prosecutors. *Manning v. Miller,* 355 F.3d at 1033.

In two sentences found in a footnote in his brief, Manning appears to suggest that he is entitled to sue Buchan for perjury under the "complaining witness" exception to the rule that witnesses are absolutely immune from suit for perjury. *See* Pltf. Mem. at 28 n.13. The Supreme Court and the Seventh Circuit have indeed recognized that "complaining witnesses" were not

11

immune from suit at common law and thus do not enjoy immunity from suits based on constitutional tort claims. *Malley v. Briggs,* 475 U.S. 335, 340 (1986); *Gauger v. Hendle,* 349 F.3d 354, 358 (7th Cir. 2004); *Cervantes v. Jones,* 188 F.3d 805, 809-10 (7th Cir. 1999). But whether a particular individual is a complaining witness is a fact-laden inquiry, *see Cervantes,* 188 F.3d at 810 n.5, and Manning has made no attempt to develop the point in the footnote or elsewhere in his brief. The Court considers the point to have been forfeited. *See, e.g., Luellen v. City of East Chicago,* 350 F.3d 604, 612 n.5 (7th Cir. 2003) (perfunctory and undeveloped arguments may be deemed waived).

To determine whether a government official is entitled to qualified immunity from suit, a court considers first whether the official violated the plaintiff's rights, and second whether the particular right was clearly established at the time of the violation. *See, e.g., Saucier v. Katz,* 533 U.S. 194 (2001); *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998). The second question was answered in the affirmative by the Seventh Circuit in the interlocutory appeal. *Manning v. Miller,* 355 F.3d at 1034. The first question requires the Court to ask whether the facts, "taken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201. That is precisely the inquiry the Court has just conducted; if we view the evidence favorably to Manning, the defendants plainly violated his due process rights.

Defendants' qualified immunity argument on to the Illinois murder case, *see* Dfdt. Mem. at 22-25, suffers from several additional infirmities. First, they focus on the fact that payments to informants are common and could not be seen as improper by a reasonable law enforcement agent. But as noted above, this mischaracterizes Manning's claim; the primary focus of the claim

12

is not the purported impropriety of the payments to Dye. Second, defendants attempt to recast Manning's claim as a claim that they used an unreliable witness. This is so wide of the mark that it is difficult to see how the argument can be made with a straight face. The claim is that the defendants induced Dye to fabricate evidence and assisted him in doing so. No sensible argument can be made that qualified immunity protects such conduct, and in any event the Seventh Circuit squarely held otherwise on defendants' interlocutory appeal. Third, defendants argue that "[t]here is no reason why they would want to destroy their honor and risk their careers by manufacturing a false confession with a jailhouse informant." Dfdt. Mem. at 24-25. This argument might well carry the day at trial, but it has no place on a summary judgment motion. The question in this context is not which side's evidence is stronger, but whether the plaintiff has offered evidence from which a reasonable fact finder could determine that the defendants violated a clearly established constitutional right. As the Court has already determined, Manning has done so.

For these reasons, Buchan and Miller are not entitled to summary judgment on Manning's *Bivens* claim regarding the Illinois murder case.

### 3.    Missouri kidnapping case

Manning's fabrication-of-evidence claim regarding the Missouri kidnapping primarily concerns the testimony of Anthony Mammolito, an alleged participant in the kidnapping who implicated Manning. Manning contends that the defendants, in concert with Buffalo Grove police detective Robert Quid, induced Mammolito to falsely implicate Manning.

A reasonable fact finder could find as follows with regard to the Missouri kidnapping case. In 1989, Buchan and Quid, who was responsible for his department's then-stalled

13

investigation of the McKillip murder, reached an understanding that they would investigate Manning together. Pursuant to this understanding, Quid traveled to Louisiana in August 1989 to interview Anthony Mammolito, an associate of Manning and McKillip. Quid's direct interest in Manning concerned the McKillip murder. But Mammolito told Quid that he had no evidence about that murder.

Quid inquired of Mammolito whether he had anything else that could be used to get Manning off the streets. He knew, and may have taken advantage of, the fact that Mammolito blamed Manning for cooperating with the authorities against him and ultimately putting him in prison, and also believed Manning responsible for the death of McKillip, who had been Mammolito's friend.

Manning told Quid that he, McKillip, Gary Engel, and Manning had devised and carried out a plan to rob a drug dealer in Kansas City. According to Mammolito, Manning and Engel abducted the drug dealer and a passenger in his car, then along with Mammolito and McKillip took them to a prearranged location, where they were held for ransom. Mammolito said that he and McKillip had picked up the ransom money from the drug dealer's brother in law, after which the victims were released. Mammolito told Quid, however, that he was unwilling to testify in court.

After some months passed, Quid returned to Mammolito and asked him to cooperate further, saying the authorities needed him to be able to pursue the case. Mammolito was still reluctant to testify, as he did not want to be viewed as a snitch. Quid showed Mammolito photographs of murder victims, some mutilated, and attributed their deaths to Manning. He pressured Mammolito to cooperate.

14

There is evidence reflecting that at some point in time, Mammolito was observed with copies of police investigative reports about the Missouri kidnapping. A reasonable fact finder could (but, of course, would not be required to) infer that he had obtained these from or at the behest of Quid, who had been urging Mammolito to cooperate with the authorities against Manning.

There is also evidence from which a reasonable fact finder could infer that Mammolito reached an agreement with Quid to be paid money in return for testifying – despite his later testimony at Manning's Missouri trial that he had received no benefits, other than non-prosecution, in return for his testimony. A good deal of the evidence that Manning offers on this score is hearsay – out of court statements by Mammolito – that could be used, if at all, only to impeach Mammolito, and not to prove the truth of what Mammolito said. But there is evidence, though certainly less than overwhelming, that Mammolito reached such an understanding with Quid.

In February 1992, after Manning's Missouri conviction, Mammolito wrote Quid to "remind" him of their agreement that Mammolito would be paid. In November 1992, another Buffalo Grove officer sent Mammolito's mother a check for $500 (a much smaller sum, to be sure, than Mammolito had mentioned in his letter), along with an apology for not writing sooner. The February 1992 letter might well be inadmissible hearsay in and of itself,[1] but even if so, it likely is admissible in conjunction with Buffalo Grove's response, for the purpose of showing

---

[1] The Court is not entirely certain about this, as Manning did not have an opportunity to reply to the defendants' Local Rule 56.1(b)(3) statement in which they argued the letter was hearsay. It is conceivable that a case could be made for admitting Mammolito's letter to Quid pursuant to Rule 801(d)(2)(E) as a statement by a co-conspirator in furtherance of the alleged conspiracy.

15

why the department acted as it did in November 1992. *See generally* 4 C. Mueller & L. Kirkpatrick, Federal Evidence § 387 at 82-84 (2d ed. 1994 & supp. 2004) (citing cases). In addition, there is evidence that Mammolito was observed enjoying other benefits not available to other inmates at the prison.

Defendants note that a good deal of the evidence points to a conclusion that Mammolito's deal, if he had one, was with the Missouri prosecutors, not with Quid. But the evidence in this regard is equivocal – the prosecutors have denied any knowledge of an agreement to pay Mammolito – and the fact that Buffalo Grove was the entity that ultimately paid Mammolito's mother is, along with the other admissible facts cited by Manning, evidence from which a reasonable fact finder could determine that he had a side agreement with Quid, undisclosed to the prosecutors or to Manning at the Missouri trial, to be paid in return for cooperating against Manning.

Manning has denied involvement in the kidnapping, and that is sufficient to create a genuine issue regarding the veracity of Mammolito's account. But evidence that Mammolito invented Manning's involvement in the crime, even together with the evidence that he had a side deal with Quid to be paid, would be insufficient by itself to hold defendants Buchan and Miller responsible for knowingly fabricating Mammolito's testimony.[2] For that, there must be evidence from which a fact finder reasonably could determine that Quid, acting in concert with the defendants, was behind the fabrication.

For summary judgment purposes, this is a closer question than the parallel inquiry

---

[2] Such evidence likely would suffice to hold the defendants liable for a simple *Brady* violation based on the concealment of the alleged side deal. But the Court need not reach this issue in view of our disposition of the more comprehensive fabrication-of-evidence claim.

16

regarding the Pellegrino murder case. The Court nevertheless concludes that a fact finder, drawing reasonable inferences in Manning's favor, could make the necessary determination. It is certainly possible that a fact finder could determine that Mammolito testified falsely and did so, without prodding or help, for his own reasons. But a fact finder, piecing together the following facts and the additional evidence offered by Manning, reasonably could determine that Quid induced Mammolito to fabricate a story:

- Manning's denial of involvement in the kidnapping;

- Quid's knowledge of Mammolito's ill will against Manning;

- Quid's statement to Mammolito that he was looking for something to get Manning off the streets;

- Mammolito's initial unwillingness to testify;

- Quid's renewed urging of Mammolito to assist the authorities in prosecuting Manning;

- the alleged agreement, undisclosed to prosecutors, to pay Mammolito if he testified;

- Mammolito's receipt of "perks" within the prison;

- Quid's alleged providing of copies of police reports so Mammolito could shape his testimony; and

- the eventual re-molding of Mammolito's story to name Manning as having picked up the ransom.

Finally, a fact finder reasonably could infer that Quid acted pursuant to an understanding or conspiracy with Buchan and Miller. As noted earlier, there is evidence supporting the proposition that the latter defendants had a motive to make a case or cases against Manning; there is also evidence that Quid shared that motive, and that he met with Mammolito pursuant to

17

an express understanding that someone other than an FBI agent had to deal with Mammolito because he might harbor ill will against the federal agency. Once it became clear that Mammolito had no evidence on the McKillip murder, Buffalo Grove had no further direct interest in the matter. Despite this, Quid continued to work on the Missouri case and, it reasonably could be found, took the lead role in the effort to persuade Mammolito to testify against Manning. The evidence of Mammolito's alleged understanding with Quid's department to pay him, an agreement of which the prosecutors claim to have been unaware, is further evidence that Quid was acting pursuant to a larger understanding to use improper means to convince Mammolito to help the defendants to get Manning off the street.

A conspiracy to do something illicit is, by its very nature, covert. And as a result, the existence of such a conspiracy is virtually impossible to prove by direct evidence, absent cooperation or a slip-of-the-lip by one of its members. *See, e.g., Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980). Thus as in other types of cases, direct evidence is not required; circumstantial evidence of the conspiracy's existence may suffice. *Id.* (citing cases). A showing that the alleged conspirators have committed acts that "are unlikely to have been undertaken without an agreement" may allow a fact finder to infer the existence of a conspiracy. *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir. 1991). The Seventh Circuit has stated that "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." *Hampton,* 600 F.2d at 621 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970)). The

possibility that other inferences could be drawn that would provide an alternative explanation for the defendants' conduct does not entitle them to summary judgment. "The fact 'that all of the evidence . . . does not point in one direction and different inferences might reasonably be drawn from it' does not justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed." *Id.* (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700-01 (1962)).

In this case, as in the Supreme Court's decision in *Adickes*, "the sequence of events create[s] a substantial enough possibility of a conspiracy to allow [the plaintiff] to proceed to trial, especially given the fact that the non-circumstantial evidence of the conspiracy could only come from adverse witnesses." *Adickes*, 398 U.S. at 157. In this regard, the evidence offered by Manning of what a fact finder reasonably could determine was an attempt by Buchan and Quid to manipulate or coerce Gary Engel to testify falsely against Manning, and an effort by Buchan to intimidate one of Manning's defense witnesses, Bruce Vaccaro, lend further support to the claim of joint action to fabricate a case against Manning. A good deal of the testimony offered by Manning in this regard is of suspect veracity, and well might not be accepted by a fact finder. But those are matters that are properly decided after a trial, not on summary judgment.

The Court need not address at this juncture Manning's contention that another witness in the Missouri case, Carolyn Heldenbrand, was manipulated by Buchan into identifying Manning as the man who picked up the ransom.[3] A fact finder reasonably could determine that the alleged fabrication of Mammolito's incriminating testimony was the linchpin in permitting the

---

[3] The Court recognizes that the Heldenbrand issue likely will have to be addressed *in limine* prior to trial.

prosecution of Manning in Missouri to proceed and that it was material in securing his conviction.

### 4.    Missouri kidnapping case - immunity

Defendants' qualified immunity argument regarding the Missouri kidnapping case suffers from the same deficiencies as their immunity argument on the Illinois murder case. Manning's claim is not merely about "pay[ing] informants for their work," Dfdt. Mem. at 22, or the exercise of judgment, *id.*, but rather concerns fabrication and manipulation of evidence to obtain a criminal conviction. The Seventh Circuit held in defendants' interlocutory appeal that such claims cannot be defeated by a qualified immunity defense. The facts, taken in the light most favorable to Manning as required at this juncture, are sufficient to show violation of Manning's clearly established due process right to a fair trial.

Manning's claims concerning the Missouri kidnapping case also include a claim that the defendants violated his Sixth Amendment rights in connection with Dye's elicitation of statements from him about the Missouri case despite defendants' awareness that court proceedings in that case had been instituted and Manning had counsel. The defendants raise several arguments regarding this claim, but for present purposes the Court need deal only with one: their defense of qualified immunity.

It is not genuinely disputed that Miller and Buchan were specifically advised by an Assistant United States Attorney, Canella Henrichs, that their use of Dye as an informant was proper. *See* Dfdt. LR 56.1(a) Stmt. ¶¶ 146-47; Pltf. LR 56.1(a) Resp. ¶¶ 146-47 (objecting only that Henrichs' testimony suggests she had no independent recollection, a contention the Court rejects). A contemporaneously-prepared memorandum confirms Henrichs' approval. *See* Pltf.

Ex. 83. Reliance on advice of counsel entitles a law enforcement officer to qualified immunity. *See Davis v. Zirkelbach,* 149 F.3d 614, 620-21 (7th Cir. 1998).

Manning objects to defendants' assertion of what he calls an "advice of counsel" defense without having pled it in their answer, but the Court rejects that argument; the defense is that of qualified immunity, which was in fact pled by the defendants. Manning also argues that defendants should be precluded from relying on Henrichs' advice because they resisted, on privilege grounds, inquiry into the underlying circumstances. Again, the Court disagrees; defendants waived the privilege as to Henrichs' advice and the exchange of information between the agents and herself. *See* Dfdt. Ex. 11 (Henrichs deposition) at 16-17, 22. Buchan and Miller are entitled to qualified immunity on this claim; Manning thus cannot pursue his Sixth Amendment claim against them.

## C. RICO claims (Counts 11 & 12)

Manning contends that defendants Buchan and Miller violated the RICO statute by way of the same conduct discussed in the previous sections. The defendants' discussion of this claim in their opening brief was relatively perfunctory; they simply listed and defined several of the requirements for a successful RICO claim and then closed by stating that they were unclear how Manning intended to prove the RICO claim and thus did not really believe they had anything to respond to. *See* Dfdt. Mem. at 31-33. Tossing the ball into the court of the party with the burden of proof is a legally permissible way to move for summary judgment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986), but it is not particularly helpful to a court trying to figure out which of the many aspects of RICO liability we must address.

The defendants' reply to Manning's response was similarly curt, but it at least allows the

Court to focus on what apparently is at issue. Defendants appear to contend that there is no evidence supporting any of the alleged predicate acts, that the alleged conduct does not add up to a "pattern" of racketeering activity, and that the nature of the RICO "enterprise" is unclear. *See* Dfdt. Reply at 21-22.

We begin with the last of these points. It appears from Manning's second amended complaint that contends the RICO enterprise is the FBI. *See* 2d Am. Cplt. ¶¶ 94-95, 97. A governmental agencies, including a law enforcement agency, properly can serve as a RICO enterprise under 18 U.S.C. § 1961(4). *See, e.g., United States v. Grzywacz,* 603 F.2d 682, 685-86 (7th Cir. 1979); *see also, DeFalco v. Bernas,* 244 F.3d 286, 307-08 (2d Cir. 2001). Beyond this, defendants have provided the Court with no argument on the enterprise issue.

Defendants' argument regarding the sufficiency of the predicate acts appears, from their reply brief, to be confined to the contention that "for all the reasons stated in the other sections of defendants' motion and reply, Manning has insufficient evidence to prove predicate acts ...." Dfdt. Reply at 21. This sufficiency-of-the-evidence argument fails for the reasons previously discussed; the Court has found that a fact finder reasonably could determine that the defendants importuned witnesses to fabricate key evidence used to convict Manning in both the Illinois and Missouri cases and that they did so, in part, by using inducements of various sorts.

There is, however, a potentially more significant point that defendants have not raised, one that the Court will require the parties to address before they and a jury have to spend the additional time and effort that would accompany a trial on the RICO claims. Manning says that the predicate acts largely consist of violations of various federal obstruction of justice statutes, including 18 U.S.C. §§ 1503, 1510, and 1512. Pltf. Resp. at 32. But these statutes prohibit

witness tampering, bribery, and obstruction only in relation to *federal* cases, *see, e.g., O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 707 (2d Cir. 1990); *United States v. George,* 625 F.2d 1081, 1089 (3d Cir. 1980); *United States v. Cuesta,* 597 F.2d 903, 918 (5th Cir. 1979); *United States v. Regina,* 504 F. Supp. 629, 631 (D. Md. 1980), and Manning's prosecutions were undertaken in state court. Manning also appears to rely on the Illinois bribery statute, violation of which can serve as a predicate act under RICO. It is an open question whether, and under what circumstances, a state bribery statute prohibits inducements given to a witness to testify for the prosecution in a criminal case. Because the parties have not addressed the point, there is no reason for the Court to delve into it unaided. We will insist, however, that it be addressed before trial.

Assuming Manning overcomes the predicate act hurdle, a reasonable fact finder could determine that the alleged acts constitute a "pattern" of racketeering activity within the meaning of 18 U.S.C. § 1961(5). To show a RICO pattern, the plaintiff must prove the defendant's commission of a series of predicate racketeering acts that show "continuity plus relationship." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). In the Seventh Circuit, courts examine four factors to identify whether a pattern exists: (1) the number and variety of predicate acts and length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir. 1986).

Defendants appear to argue that Manning's claim is deficient because the alleged activity was "close-ended," ending in Manning's conviction. But that does not necessarily put his claims outside RICO's scope. To demonstrate a pattern over a closed period, where no continuing threat

of racketeering activity is expressly alleged, a plaintiff must show a "'series of related predicates extending over a substantial period of time.'" *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989)). Manning has met that requirement in this case, at least to the extent necessary to avoid summary judgment. Specifically, he has offered evidence of a series of acts that extended over a period of two to three years; that, although they had a single immediate intended victim (Manning), involved two completely distinct criminal prosecutions in two different and independent jurisdictions; and that resulted in two distinct injuries, namely the conviction and death sentence in the Illinois case and the conviction and life prison term in the Missouri case.

Defendants identify no separate defects regarding Manning's RICO conspiracy claim.

For these reasons, the Court denies summary judgment on Counts 11 and 12.

## D.    Federal Tort Claims Act claims (Counts 3, 9 & 13)

Manning brings three Federal Tort Claims Act claims against the United States: malicious prosecution claims concerning both the Illinois and Missouri prosecutions (Counts 3 and 9) and an intentional infliction of emotional distress claim based on the Missouri prosecution (Count 13).[4] Under the FTCA, the United States is liable "in the manner and to the same extent as a private individual under the circumstances." 28 U.S.C. § 2674. Liability under the FTCA is governed by the law of the place of the act or omission in question. 28 U.S.C. § 1346(b);

---

[4] Counts 9 and 13 were dismissed earlier this year for failure to exhaust administrative remedies, but Manning thereafter completed that process and refiled these claims as a new case which was reassigned to this Court's docket. *See Manning v. United States*, No. 04 C 5972. The Court will treat these claims as having been reincorporated into the present case, and the newly-filed case will be dismissed. The United States is directed to answer those claims within seven days of this order.

*Richards v. United States,* 369 U.S. 1, 9 (1962). In this case, both sides appear to assume that Illinois law governs.

### 1.    Malicious prosecution claims

To maintain a malicious prosecution claim under Illinois law, the plaintiff must show that (1) he was subjected to judicial proceedings; (2) for which probable cause was lacking; (3) the defendant instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury. *See Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir. 1996). The United States argues that Manning has offered insufficient evidence that the cases were terminated in his favor, that Buchan or Miller acted with malice, or that probable cause was lacking. Def. Mem. at 34.

Both cases against Manning were dismissed following reversal of his convictions, by way of motion by the prosecutors to *nolle prosequi* the cases. Under Illinois law, "a criminal prosecution has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi,* unless the abandonment is for reasons not indicative of the innocence of the accused." *Swick v. Liautaud,* 169 Ill. 2d 504, 513, 662 N.E.2d 1238, 1242-43 (1996). The plaintiff meets his burden by showing "that the *nolle prosequi* was entered for reasons consistent with his innocence." *Id.* at 514, 662 N.E.2d at 1243. In making this determination, the court examines the circumstances surrounding the termination. *Id.* at 513-14, 662 N.E.2d at 1243; *see also, Cult Awareness Network v. Church of Scientology,* 177 Ill. 2d 267, 279, 685 N.E.2d 1347, 1353 (1997).

Under *Swick,* a *nolle prosequi* is considered a termination favorable to the accused if "[t]he circumstances surrounding the abandonment of the criminal proceedings . . . compel an

inference that there existed a lack of reasonable grounds to pursue the criminal prosecution."

*Swick*, 169 Ill. 2d at 513-14, 662 N.E.2d at 1243. Manning has offered a sufficient basis to

permit a fact finder to draw such an inference with respect to both the Illinois and Missouri

prosecutions. *See* Pltf. LR 56.1(b)(3) Stmt. ¶¶ 206-11 (Illinois), 212-21 (Missouri). Specifically,

in both instances, there is evidence that the prosecutors dropped the cases because they did not

believe they had sufficient evidence to pursue them. *See, e.g., id.* ¶¶ 207-09, 213-14.

The United States' argument in its opening brief on the issue of probable cause consisted,

in its entirety, of the following:

> Manning was *convicted* by juries on both the murder and the kidnapping charges.
> Yes, both convictions were overturned, but not for lack of evidence. Both the
> Illinois Supreme Court and the Eighth Circuit remanded the cases for trial,
> recognizing that there was sufficient evidence to support a conviction.

Dfdt. Mem. at 34 (emphasis in original). This argument, insufficiently developed to warrant

consideration in the first place, also suffered from a fatal flaw, as Manning pointed out in his

response: critical evidence used to obtain both convictions was, we must assume for present

purposes, fabricated by the defendants. Thus simple reliance on convictions and remands that

were premised on records that included that evidence could not possibly carry the day.

In its reply brief, the United States attempted to salvage the point by trying to show that

the remaining evidence, aside from that attacked by Manning, was sufficient to establish

probable cause. *See* Dfdt. Reply at 19-20. That is not cricket. A party cannot use a reply brief to

make arguments it chose to forego in its opening memorandum. *See, e.g., Multi-Ad Svcs., Inc. v.

NLRB*, 255 F.3d 363, 370 (7th Cir. 2001) (party may not raise new arguments or present new

facts for the first time in reply brief). Were the Court to permit this, we could not do so fairly

without reopening briefing to allow Manning to respond to the newly-made point – which would defeat the purpose of setting a briefing schedule in the first place. For this reason, the Court considers the point forfeited for present purposes. In any event, there is sufficient evidence to permit a reasonable fact finder to determine that the evidence the defendants are claimed to have fabricated was essential to both cases, that neither would have been brought without that evidence, and that probable cause was lacking when only the remaining evidence is considered.

We turn finally to the question of malice. In a malicious prosecution case, malice consists institution of a prosecution for an improper motive, that is, a reason other than to bring the party to justice for the crime with which he was charged. *See, e.g., Johnson v. Target Stores, Inc.,* 341 Ill. App. 3d 56, 76-77, 791 N.E.2d 1206, 1222 (2003); *Mack v. First Security Bank of Chicago,* 158 Ill. App. 3d 497, 501, 511 N.E.2d 714, 717 (1987). Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith. *See Mack,* 158 Ill. App. 3d at 501, 511 N.E.2d at 717. In this case, both the evidence tending to show lack of probable cause, and the evidence from which a fact finder could determine that Buchan and Miller acted for an improper purpose, are sufficient for Manning to avoid summary judgment.

## 2. Intentional infliction of emotional distress claim (Count 13)

On Manning's IIED claim, the United States argues only that the claim cannot be maintained absent proof of the elements of malicious prosecution. *See* Dfdt. Mem. at 34-35. Perhaps so, but as the Court has concluded that genuine issues of fact preclude summary judgment on the malicious prosecution claim, the same is true on the IIED claim.

**Conclusion**

For the reasons stated above, the Court grants defendants' motion for summary judgment [# 134] on Counts 5, 6, and 10, as well as on the Sixth Amendment claim contained within Count 7. Summary judgment is likewise granted for defendant O'Rourke on all claims against him. Count 4 is dismissed because the only defendant named in that claim was previously dismissed on consent. Defendants' motion for summary judgment on the remaining claims is denied. Plaintiff's motion to strike [# 147] is denied as moot. The claims in Case No. 04 C 5972 are deemed to have been incorporated into Manning's second amended complaint in this case, and for this reason, Case No. 04 C 5972 is dismissed as a separate case.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 5, 2004