# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 372 | **DATE** | 12/3/2004 |
| **CASE TITLE** | Steven Manning vs. Robert Buchan, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: the Court grants Manning's motion to impose negative evidentiary consequences (114-1); denies Manning's fourth motion to compel (167-1); grants in part and denied in part Manning's and defendants' motions in limine (171-1, 172-1, 173-1 & 173-2); denies Manning's motion to reconsider (177-1) and his motion for leave to file amended complaint (180-1); and defers ruling on Manning's motion in limine regarding evidence of "antisocial personality disorder" (184-1). The motion for leave to file an additional appearance (169-1) was previously granted and is therefore terminated. The case is held for a combined jury/bench trial on 12/6/04 at 9:45 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | DEC 06 2004 | |
| ✓ | Notices mailed by judge's staff. | | date docketed | 190 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 12/3/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GL | courtroom deputy's initials | | GL mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN MANNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 02 C 372 |
| | ) | |
| ROBERT BUCHAN; GARY MILLER; | ) | |
| and UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

DEC 0 6 2004

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this Memorandum Opinion, the Court rules on a number of disputed matters preliminary to the trial of the case, set to begin on Monday, December 6, 2004.

## A. Plaintiff's fourth motion to compel

1. Defendants asserted the attorney-client and work product privileges with regard to documents in the files of the United States Attorney's Office regarding dealings with Thomas Dye. The defendants have provided a privilege log containing forty items.[1] The defendants relied on the approval of Assistant United States Attorney Canella Henrichs in support of a defense of qualified immunity with regard to Manning's claim his Sixth Amendment rights were violated by the defendants' decision to have an informant elicit information from him. The Court accepted this defense on summary judgment.

Manning argues that by raising the immunity defense based on advice of counsel,

---

[1] In many instances, that the log does not provide sufficient information to allow the Court to determine the subject matter of the documents.

defendants waived the privileges in their entirety. The Court rejects that argument. It is true that the attorney-client privilege is waived if the defendant asserts a defense that puts the attorney's advice at issue. *See, e.g., Garcia v. Zenith Electric Corp.,* 58 F.3d 1171, 1175 (7th Cir. 1995). But as a general rule, the scope of the waiver extends only to the subject matter of the communications that were made to obtain the advice. *See, e.g., Motorola, Inc. v. Vosi Technologies, Inc.,* No. 01 C 4182, 2002 WL 1917256, *1 (N.D. Ill. Aug. 19, 2002). Defendants expressly waived the privilege with regard to the communications that the Federal Bureau of Investigation made to Henrichs in seeking her approval and allowed inquiry of Henrichs regarding the information given to her in connection with the request to approve the recording of Dye's conversations with Manning. But they did not – either expressly or by implication – waive the privilege for matters unrelated to that particular request for advice.

The Court reviewed the privilege log and, at the hearing on this motion, directed the defendants to produce for *in camera* inspection one item from the list. Defendants have done so and have also produced it to Manning's counsel.

2.      Manning asks for production of Henrichs' so-called "grand jury file" regarding Dye's testimony before a federal grand jury regarding Manning. Manning contends the testimony was perjurious. Defendants have resisted production based on Federal Rule of Criminal Procedure 6(e). The Court has previously ruled on this matter. Manning has failed to show the "particularized need" required to permit disclosure of this material. *See, e.g., United States v. Sells Engineering, Inc.,* 463 U.S. 418, 443 (1983).

3.      Manning's request for any informant / cooperating witness file on Curtis Stover is denied as moot, based on the defendants' representation that there is no such file.

2

4.      With regard to Manning's request for production of any Drug Enforcement

Administration documents memorializing or summarizing statements given by Ronald

Tyrakowski following his arrest in the summer of 1991, the Court finds that such documents

were requested and that the defendants' imposition of a limitation on its search for records to

those in the hands of the United States Attorney's Office and the FBI was, in this particular

instance, unwarranted.  Any such statements are to be produced forthwith, and in any event by no

later than 9:00 a.m. on December 6, 2004.

**B.      Plaintiff's motion for leave to file amended
complaint to conform legal theories to proof at trial**

The Court granted summary judgment against Manning on his § 1983 claims, as he

effectively abandoned them in response to defendants' motion, making no argument to rebut

defendants' contention that they had not acted under color of law.  Manning, having belatedly

discovered that this leaves him without any claim other than the RICO claims on which he will

be entitled to attorney's fees if he prevails, has now moved to file a third amended complaint

reasserting the § 1983 claim.  This motion is misnamed.  It is not truly a motion for leave to

amend – the second amended complaint already included § 1983 claims.  Rather, it is a motion

for reconsideration.  The motion is denied.  Reconsideration is appropriate, generally speaking,

only when *the Court* overlooked or misunderstood something; it is an inappropriate way of

asserting arguments that were overlooked by *a party* to whom the arguments were then available.

*See, e.g., Bank of Waukegan v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.

1990); *Quaker Alloy Casting Co. v. Gulfco Inds., Inc.,* 123 F.R.D. 282, 288 (N.D. Ill. 1988).

3

C. **Plaintiff's motion to compel production of all evidence relating to conjugal visits to Thomas Dye in the FBI offices**

At a deposition taken on October 18, 2004, Thomas Dye testified that while he was a prisoner at the Metropolitan Correctional Center and working with the FBI as a cooperating witness against Manning in 1989 and the early 1990's, he was permitted by agents Buchan and Miller to have numerous unsupervised conjugal visits in the FBI's Chicago office. In a motion filed six weeks later (on the day after Thanksgiving, when the Court was closed, and just 10 days before trial), Manning asks the Court to order defendants to produce any and all documents relating to any such visits. The defendants deny that any such visits occurred, contending that Dye is making it up.

Manning requests production of all visitors' logs for an unspecified period. The request is denied. The Court agrees that material reflecting such visits would be relevant if it existed. But in view of the burdensomeness of the request – it would require a monumental search for, and of, voluminous records for a long but unspecified period of time – the Court finds that Manning waited too long to pursue the issue. To order the search to be done at this time would likely derail defendants' trial preparation to a significant extent. The Court is unwilling to take that step on a matter that was, or reasonably should have been, obvious to Manning's counsel at the moment Dye testified about the purported conjugal visits.

D. **Plaintiff's motion to reconsider adverse ruling on Sixth Amendment claim**

The Court denies Manning's motion to reconsider the Court's qualified immunity finding on Manning's claim of violation of his Sixth Amendment rights. Most of Manning's arguments in the motion were made and rejected at the time of that ruling and thus are not an appropriate

4

subject for reconsideration. In addition, the Court has reviewed the entirety of the deposition of AUSA Henrichs (whose approval of the recording of Dye's conversations with Manning formed the basis for the qualified immunity ruling), and finds that Manning was not, contrary to his argument, hampered in inquiring of Henrichs regarding the information she was given by the FBI that led to her approval of the recording of Dye's conversations with Manning. The Court rejects the remaining arguments made by Manning for the reasons stated in open court when this motion was argued.

### E. Defendants' motions *in limine*

#### 1. Impeachment of Dye

Defendants want to prevent Manning from impeaching Dye with any information that was unknown to defendants Miller or Buchan or that was not presented at Manning's trials. They have offered no legal basis for limiting impeachment in this manner. That is not to say that everything that Manning might use is otherwise proper impeachment, but any such issues will have to be taken up on an item-by-item basis.

The Court agrees with defendants that statements made by the United States Attorney's Office about Dye's credibility do not constitute proper impeachment of Dye and are not admissible against Miller or Buchan on any other basis. It is conceivable they may be admissible for some proper purpose against the government, but because the FTCA claims against the government are being tried to the Court, not the jury, that subject can be deferred until a later point during the trial. The parties are advised to bring the matter to the Court's attention at some appropriate time.

## 2. Qualified immunity issues

Defendants Buchan and Miller seek to preclude evidence of various matters on which they say they are entitled to qualified immunity and which, they say, the Court "refrained from resolving" on summary judgment. In this regard, the Court incorporates an order we entered clarifying the summary judgment ruling after we had reviewed this part of defendants' motions *in limine*:

> The Court has reviewed the motions *in limine* filed by the parties. Defendants' motion includes a contention that in dealing with the defendants' summary judgment motion, the Court "refrained from resolving qualified immunity issues" on what defendants characterize as five *Brady v. Maryland* claims made by plaintiff. *See* Dfdts' Mots. In Limine at 2. This contention reflects a misconception regarding the claims made by the plaintiff in this case, and a misunderstanding of the summary judgment motion and the Court's ruling. This order is entered to correct the misconception and misunderstanding.
>
> First, the plaintiff has not made, as defendants' argument suggests, a series of mini-claims for relief, each arising out of a particular bit of evidence claimed to have been concealed in connection with the plaintiff's convictions in Illinois for murder and in Missouri for kidnapping. Rather, with regard to each trial, the plaintiff has made, as referenced at pages 5-6 of the Court's summary judgment ruling, a single *Bivens* claim against the individual defendants and a single malicious prosecution claim against the government (as well as parallel RICO claims). In the *Bivens* claims, the plaintiff contends that the defendants, by using various inducements, fabricated inculpatory evidence that was used at the trials and concealed a variety of matters that are said to have been exculpatory or impeaching. It is a single claim for each trial, not a constellation of separate sub-claims.
>
> Second, summary judgment may be sought only as to a claim, not as to a bit or piece of a claim. *See generally Jamsports and Entertainment, LLC v. Paradama Productions, Inc.,* 336 F. Supp. 2d 824, 845 (N.D. Ill. 2004) (citing *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 217 (7th Cir. 1946), and other cases). But even were such an approach proper, the defendants' summary judgment memorandum, even read liberally, did not ask the Court to grant summary judgment on qualified immunity as to the particular pieces of evidence catalogued by defendants in their motion *in limine*. The legal discussion of the plaintiff's *Brady* claims in the defendants' summary judgment memorandum appears at pages 20-25. Nothing in that discussion reasonably may be construed as asking the Court to grant "summary judgment" on the supposed discrete "claims" arising from the concealment of benefits to Mammolito; benefits to Dye; a statement that Dye attributed to Tyrakowski; a

6

letter from Mrs. Pellegrino; and the act of moving Dye close to Manning. Rather, the defendants addressed the plaintiffs' claims as the Court did in its ruling, arguing that "Manning lacks any concrete evidence showing that the defendants coached and paid Dye and Mammolito to testify falsely against Manning, and then intentionally withheld this information from the prosecution in bad faith." Dfdts' SJ Mem. at 22. The Court rejected that argument in holding that a reasonable fact finder could determine that the defendants had done just that (pages 7-11 and 13-20 of our ruling), and in holding that defendants were not entitled to summary judgment on qualified immunity (pages 11-13 and 20-21). It is noteworthy that in contending that the Court "refrained" from ruling, defendants cite only their reply brief on summary judgment, not their opening brief. Dfdts' Mot. In Limine at 2. Arguments made only in a reply brief are forfeited.

Third, the Court did not, in fact, refrain from ruling on the defendants' request for summary judgment on qualified immunity as to the *Brady* claims. The defendants seem to want to think that the Court ruled only on the claims of "fabricating evidence." Not so. First, our discussion of the Illinois case clearly described Manning's claim as a claim "that the defendants fabricated the key evidence against Manning *and then concealed this fact from prosecutors and Manning's defense at trial.*" Ruling at 10 (emphasis added). We denied defendants' request for summary judgment on the merits of that claim, *id.* at 11, and made reference to that same description in denying qualified immunity. *Id.* at 12-13. Though our discussion regarding the Missouri case was not quite as crystal clear, the Court considered the claim as the plaintiff has always characterized it: fabrication of evidence *and* concealment of the fabrication from prosecutors and the defense. In short, the Court did not "refrain from resolving" the defendants' request for summary judgment on qualified immunity on the *Brady* claim; rather we denied that request for the reasons stated in our ruling.

Order of Nov. 18, 2004.

Whether or not defendants might be entitled to qualified immunity on various aspects of Manning claim – a matter that the Court can, of course, assess at trial on a motion under Federal Rule of Civil Procedure 50(a) – that would provide no basis for excluding these matters from evidence. To decide Manning's claims, the jury will be required to assess the believability of Dye and Mammolito's accounts so that it can, among other things, determine whether they were induced to fabricate evidence. Defendants' concern that the jury be prevented from finding liability based on matters that were disclosed to Manning's defense or the non-disclosure of

which was not attributable to them can, the Court believes, be handled by appropriate instructions to the jury, which we will leave it to the parties to propose.

### 3. Evidence of Sixth Amendment violation

The Court agrees with the defendants that it would be improper for Manning to introduce evidence reflecting that Buchan and Miller violated his Sixth Amendment rights by using Dye and Sylvia Herrera to elicit information from him; the Court has barred this claim on qualified immunity grounds. The Court also agrees with Manning, however, that he is likely to need to be able to explain that the improper admission of this evidence is why his Missouri conviction was overturned. Both sides' concerns may be accommodated. Manning will be permitted to elicit that the convictions were overturned because the Eighth Circuit held that the *use in evidence* of these matters violated Manning's constitutional right to counsel. The jury may be instructed at that time, and/or at the conclusion of the case, that this forms no part of the claims made against Miller or Buchan in this case. The Court will leave it to the parties to propose appropriate instructions.

### 4. Heldenbrand photographic lineup

Defendants seek to bar Manning from arguing that photographic spreads that were shown to Carolyn Heldenbrand, a prosecution witness at Manning's Missouri trial, were unduly suggestive or otherwise unlawful. They argue that a claim based on a misleading identification process cannot give rise to a civil suit for violation of the accused person's constitutional rights.

The Seventh Circuit appears to have determined, as defendants argue, that a plaintiff cannot maintain a claim against a law enforcement officer for violation of constitutional rights based exclusively on the officer's use of a suggestive identification procedure. *See Newsome v.*

*McCabe,* 319 F.3d 301, 305 (7th Cir. 2003). Rather, a constitutional claim for damages arises in

the identification context only if the officer conceals information tending to undercut the

identification from prosecutors or the defense. *See Newsome v. McCabe,* 256 F.3d 747, 749 (7th

Cir. 2001).

In response to defendants' motion *in limine,* Manning has proffered a chain of

circumstantial evidence which, if established, would permit a jury reasonably to find that

defendant Buchan did more than simply show Heldenbrand suggestive photographic displays,

that is, that he affirmatively encouraged or prompted Heldenbrand to identify Manning, and then

failed to disclose this to Missouri prosecutors or Manning's defense. *Res judicata* does not bar

this claim, as it was not presented (and did not need to be presented) to the Missouri or federal

habeas courts; if the claim is proven, the defendants are not entitled to qualified immunity, as

*Newsome* holds, *see id.* at 752-53; and the defendants do not get off the hook based on a

prosecutor's decision to use the identification without knowledge of the concealed information.

*Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir. 1988).

For these reasons, the Court rejects defendants' request to bar evidence regarding the

lineup. It will be necessary, however, to instruct the jury at some appropriate point that

Manning's claim, insofar as it is based on the Heldenbrand identification, is based on

withholding of evidence, not the mere suggestiveness of the photographic arrays that were used.

The Court will leave it to defendants to propose an appropriate limiting and/or final jury

instruction.

### 5. Expert testimony of Gary Wells

The Court rejects the defendants' request to bar the testimony of Gary Wells, a professor

of psychology who will testify as an expert in the area of eyewitness identifications. According to defendants, Wells will testify that the photographic arrays shown to Carolyn Heldenbrand were highly suggestive and that a well trained law enforcement officer would have known that the procedure was improper. As Manning points out, there is more to Wells' testimony than this. Among other things, Wells will testify regarding Heldenbrand's susceptibility to suggestion. This and other opinions he will offer are relevant even under the withholding-information theory of liability discussed in the preceding section of this Memorandum Opinion – among other reasons, Manning is entitled to try to refute the notion that Heldenbrand's identification of him was genuine and legitimate.

The Court also rejects defendants' argument that Wells' failure to perform laboratory testing renders his opinions inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 and *Daubert* both require, among other things, that an expert's testimony be based on reliable principles and methods, applied reliably to the facts. *See, e.g., United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). But the Seventh Circuit has made it clear that an expert is not required to substantiate his opinions through testing particularized to the specific case if the science he is using has already been shown experimentally to be reliable – which is what Wells will testify. *See United States v. George*, 363 F.3d 666, 672-73 (7th Cir. 2004). The primary purpose of the Rule 702 / *Daubert* inquiry is to ensure "'that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). It appears to the Court that Wells' expected testimony meets this

standard, and thus we reject defendants' *Daubert* / Rule 702 challenge. Defendants will, of course, be free to inquire on cross-examination regarding the feasibility of experimental corroboration, Wells' use of it in other cases, and his non-use of it in this case. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Finally, the Court agrees with plaintiff that Wells has sufficient background and expertise in the field to testify regarding law enforcement procedures regarding identifications. He is not required to have worked as a law enforcement officer, investigator, or prosecutor as a prerequisite to testifying on that topic.

### 6. Expert testimony of Michael Lyman

Manning intends to call Michael Lyman, a professor of criminal justice, to testify regarding a series of opinions concerning defendants' use of Thomas Dye. In his report provided pursuant to Federal Rule of Civil Procedure 26(a)(2), Lyman listed his opinions as follows:

1. Defendants were aware or should have been aware that Dye was unreliable but still chose to utilize him as an informant.

2. Defendants in this case knew or should have known that Dye's statements were false regarding Manning's "confession" of the Pellegrino murder.

3. Defendants in this case knew or should have known that Mammolito's statements about Manning's involvement in the Missouri kidnapping were false.

4. Defendants in this case ignored nationally accepted informant management guidelines by "prepping" informant Dye and providing him with case files with which to memorize aspects of the case.

5. Defendants in this case inappropriately offered informant Mammolito and

Dye favors and inducements in exchange for their testimony against Manning.

6. Defendants in this case ignored convincing evidence that would have established Manning's innocence.

7. Defendants in this case, knew or should have known that Manning was represented by an attorney, and that his 6th Amendment protections under the Constitution would be violated by prompting Dye and Herrera to discuss his pending criminal charges.

Def. Mot. *In Limine,* Ex. 3 at 4.

Defendants argue that these matters are not the appropriate subject of expert opinion, because they amount to comments on intent and credibility and the resolution of disputed fact issues. Manning contends that Lyman is simply making factual assumptions based on the record and giving expert opinions about proper law enforcement practice based on those assumptions. But it appears from the above, as well as the text of Lyman's report, that at least some of his opinions amount to assessing the evidence and making "findings" regarding the inferences and conclusions to be drawn.

It is highly doubtful whether such testimony is admissible under Rule 702. Lyman is not, strictly speaking, giving opinions on witness credibility (which, as a general rule, are improper, *see, e.g., Goodwin v. MTD Products, Inc.,* 232 F.3d 600, 609 (7th Cir. 2000)). But the Court has a hard time seeing how his apparent conclusions about what the evidence showed and his resolution of contested issues are helpful to the jury, or what the "reliable principles and methods" are that led him to those conclusions. These elements are prerequisites to admissibility under Federal Rule of Evidence 702. *See* Fed. R. Evid. 702; *see also, e.g., United States v. Young,* 316 F.3d 649, 657 (7th Cir. 2002).

In his response to defendants' motions *in limine,* Manning points out that some aspects of Lyman's testimony, regarding proper police practices, do not constitute an assessment of what the evidence shows or an opinion on credibility. *See* Pl. Resp. at 21. And at oral argument on the motion, Manning's counsel gave an outline of Lyman's testimony phrased in a manner that might make its admissibility less suspect. But the proffer was somewhat vague. As a result, the Court does not have a good enough handle on Lyman's actual expected testimony to assess its admissibility. Before Lyman's testimony can be offered at trial or mentioned before the jury, Manning will be required to make a more particularized proffer of how he expects Lyman to testify, so that defendants can respond and the Court can make a definitive ruling. This should be done as close to the start of trial as possible.

**7.     Credibility finding regarding Buchan**

Manning does not oppose defendants' motion to bar introduction of evidence that in 1995, another judge of this Court (Judge Shadur) made an adverse credibility finding regarding defendant Buchan following a hearing in an unrelated case. The motion is granted.

**8.     Prior discipline of Miller**

Manning says that after he filed this suit, he received at the Missouri prison where he was then housed a series of postcards taunting him about the case. *See* Pl. Summ. Judg. Ex. 86. Miller was disciplined by the FBI in the mid-1980's for conduct involving harassment of a fellow FBI agent named Donald Rochon. The harassment of Rochon, which involved other FBI agents besides Miller, included sending anonymous hate mail. Manning argues that Miller's participation in the harassment of Rochon is admissible evidence of *modus operandi* which can be offered in an effort to show he sent the postcards to Manning. *See, e.g., United States v.*

*Ingraham,* 832 F.2d 229, 231-33 (1st Cir. 1987).

Defendants say that all Miller did vis-a-vis Rochon was to mail coupon reply cards to magazine publishers with Rochon's name on them. If that is correct, the Rochon evidence is inadmissible, because it does not tend to establish a *modus operandi* that has any bearing on the issues in the case. But Manning contends that Miller may well have done more than this – Judge Shadur's decision in the *Rochon* case references a memo that documents "Miller's confession to many of the incidents" regarding Rochon. *Rochon v. Dillon,* 713 F. Supp. 1167, 1170 (N.D. Ill. 1989).

The Court previously reviewed *in camera* Miller's "headquarters" and "field office" FBI personnel files and directed production of a number of documents, including documents regarding the imposition of discipline in the *Rochon* matter. After receipt of the motion *in limine,* the Court again reviewed those files and saw no statement or confession of the type referenced by Judge Shadur. But we did see a letter, which we had previously overlooked, indicating the existence of a separate file regarding an administrative inquiry regarding Miller on the Rochon matter. This file, it appears, was not produced by the defense. There was no legitimate justification for its non-production. At the hearing on the motion *in limine,* defendants' counsel took the position that because Manning had not specifically identified the separate file, it was not produced. Counsel might as well have said, "Catch-22"; how was Manning's counsel to know the manner in which the FBI chooses to subdivide its files regarding its agents? A request for a personnel file – the request Manning made – quite obviously seeks all the documentation held by the employer concerning the employee. Such a request cannot be evaded by the employer's unilateral picking and choosing of what is and is not

14

to be termed a "personnel" file. The administrative inquiry files ought to have been produced for *in camera* inspection.

At this late juncture, the Court is not going to filter documents that defendants should have produced long ago. Defendants are directed to produce to Manning's counsel all documents held by the FBI relating to the administrative inquiry of Miller, including any statements Miller made in the course of that inquiry or otherwise. The production is to be made forthwith, and in any event by no later than 9:00 a.m. on Monday, December 6.[2] These documents may be used by plaintiff only for the purpose of this lawsuit and are to be viewed by Manning's counsel only, and not disclosed to Manning or anyone else, pending ruling by the Court on the admissibility of the matter at trial. If Manning's counsel propose to inquire about this topic at trial, they must first provide the Court with copies of the relevant documentation and seek a ruling regarding admissibility.

**F.    Information provided by confidential sources**

Manning seeks to bar the defendants from offering evidence regarding several crimes of which he was allegedly suspected based on information supplied by confidential informants. During discovery, documents were produced by defendants reflecting that various unnamed sources had provided information implicating Manning in several murders and other criminal activity. Manning was not charged with any of those crimes.

During the course of discovery, Manning moved to compel the defendants to identify the informants. In support of his request, Manning argued that he needed the information to show

---

[2] The Court advised defense counsel at the November 30 hearing on the motions *in limine* that production of these documents was required.

the defendants had engaged in a pattern of using informants to try to set him up for crimes he had

not committed, and also because he was concerned the defendants might argue the information

from the undisclosed persons in some way justified their actions that are challenged in this case.

In opposing disclosure, the federal defendants – all of them – relied on the informer's

privilege, which bars disclosure of the identity of confidential government informants unless the

party seeking disclosure shows his need for the information outweighs the need for

confidentiality. *See* Fed. Def. Resp. to Pl. Suppl. to Mot. to Compel at 2; *Roviaro v. United*

*States,* 353 U.S. 53 (1957); *United States v. Herrero,* 893 F.2d 1512, 1525 (7th Cir. 1990); *Dole*

*v. Local 1942, IBEW,* 870 F.2d 368, 372 (7th Cir. 1989). The defendants argued that "the

potential benefits of disclosure [to Manning] are minimal." *Id.* They argued that Manning's

contention that some or all of the informants might have been encouraged to lie was speculative,

and in any event did not establish the relevance of the informers' identities with regard to the

claims against the defendants made in this case. *Id.* With regard to Manning's second argument,

the defendants replied that "[i]nformation which the FBI had received regarding Manning's

involvement in other crimes may well be relevant – not to prove that Manning committed the

other crimes, but rather for the limited purpose of explaining why the FBI took actions which it

did, and especially to rebut arguments that specific actions were improperly motivated." *Id.* at 3-

4. Defendants argued, however, that disclosure would create "a substantial risk of harm," *id.* at

2, as "Manning is on tape making an agreement with [Thomas] Dye to kill or have killed

witnesses in Dye's case," and "[i]t is entirely possible that Manning's objective in bringing this

case is to learn the identity of the individuals who have provided information against him to the

FBI." *Id.* at 3. Defendants also indicated that Manning's motion appeared to be a veiled request

to obtain a ruling that such information was inadmissible at trial, and in response defendants urged the Court not to make such a ruling at that time. *Id.* at 3.

On September 8, 2004, the Court issued a Memorandum Opinion in which it ruled on Manning's motion to compel. *Manning v. Dye,* No. 02 C 372, 2004 WL 2032740 (N.D. Ill. Sept. 8, 2004). Aside from three informants whose identity had already been disclosed in one way or another, the Court declined to compel the defendants to identify the confidential informants. With regard to Manning's contention that he needed the identities to try to prove a pattern of prodding witnesses to implicate him falsely in various crimes, the Court indicated that the claim was speculative and that under controlling authority, the informer's privilege "'will not yield to permit a mere fishing expedition, nor upon bare speculation that the information may possibly prove useful.'" *Id.* *2 (citing *Dole,* 870 F.2d at 373). We also noted that some of the informants' statements had been made well after Dye agreed to inform on Manning, and that Manning's motion papers reflected he had obtained the identification of other informants through discovery, which the Court felt "ought to prove an adequate data base for him to mine to attempt to support his theory." *Id.* *4 n.2.

On Manning's second argument for disclosure, the Court concluded it was speculative whether the defendants would attempt to use the informants' information at trial, and that even if they did, it was unclear whether they would be able to so, as it might be "unfair to permit them to use the privilege as a sword rather than as a shield." *Id.* at 8. For this reason, the Court held that Manning's claim of need did not outweigh the interest in confidentiality. *Id.*

On September 3, 2004, just before the Court entered its Memorandum Opinion on the informer's privilege issue, Manning filed a second motion addressed to the point. In this motion,

he argued that the close of fact discovery was fast approaching and that he would no longer have the opportunity to conduct fact discovery even if the Court ordered disclosure of the informants' identities. He therefore contended that the defendants should be held to their claim of privilege and should be precluded from using the information about prior alleged criminal activity provided by the informants whose identity the defendants had resisted disclosing. Manning also indicated at oral argument, and later (more fully) in writing, that he sought exclusion of the evidence under Federal Rule of Evidence 403.

A trial in which the defendants were permitted to declare before the jury that unnamed sources had implicated Manning in a variety of violent crimes, including several murders, would be an adversary proceeding in name only. It would be grossly unfair to require Manning to abide the defendants' use of the informants' claims without any ability to reply effectively. Though he obviously could take the stand himself and deny the informants' claims, that alone does not give him a fair opportunity to rebut the defendants' evidence. The claimed significance of the information stems from the contention that it was provided to the government by supposedly believable sources. Without knowing the identity of the sources, Manning is completely unable to challenge either part of that claim – that the sources actually provided the information, and that there was reason to believe them. That is why the defendants' contention that Manning is not harmed, because "[t]he information from the sources has been released," *see* Def. Resp. at 5, is without merit – Manning has no ability to challenge the defendants' *reliance* on the information without the identities of the sources who provided the information to the government.[3]

---

[3] In this regard, it is noteworthy that Manning has offered evidence from which a fact finder reasonably could determine that some of the now-disclosed informants against him were prodded to fabricate information.

18

Ordinarily when a party asserts a privilege to preclude its opponent from obtaining information in discovery, it relinquishes the ability to use that information in its favor at trial. *See, e.g., United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) (attorney-client privilege); *Harris v. City of Chicago*, 266 F.3d 750, 754 (7th Cir. 2001) (Fifth Amendment privilege); *Santelli v. Electro-Motive*, 188 F.R.D. 306, 308 (N.D. Ill. 1999) (psychotherapist-patient privilege). The rationale is that it is unfair to allow a party to make selective use of information helpful to him while blocking inquiry into other aspects of the information that might be unhelpful. *See, e.g., Workman*, 138 F.3d at 1263. The same considerations apply here. *See Jones v. United States*, 9 F. Supp. 2d 1119, 1139 (D. Neb. 1998) (applying the same principle following assertion of informer's privilege). *Jones* involved a claim for damages arising from the wrongful disclosure of tax return information by an IRS agent to a confidential informant. The court sustained the defendant's assertion of the informer's privilege, and as in this case, "at the government's insistence ... prohibited the plaintiffs from discovering the identity of the informant." *Id.* For this reason, the court precluded the defendant from arguing that the plaintiff had failed to prove who had received the disclosure, stating that the defendant could not use the privilege as both a shield and a sword. *Id.*

The same is true in this case. The defendants – again, all of them[4] – resisted discovery of the basic information that Manning needed to attempt to refute the contention that the confidential informants' information contributed to their decision to place an informant (Dye)

---

[4] In addition to the fact that the objection to Manning's motion to compel disclosure of the informants' identity was made by all the federal defendants, defendant Buchan individually asserted the informer's privilege during his deposition, relying on promises of confidentiality he said he had made.

with Manning in the Cook County Jail, their belief in Dye's attribution of incriminating disclosures to Manning, and various other matters at issue in this case. Defendants seem to think that having succeeded in sustaining the privilege, they now have free rein to use the unnamed informants' information for whatever purpose they believe is appropriate. The defendants, who cite no authority for this proposition, have it backwards. Having succeeded in sustaining the privilege and in stymieing Manning's ability to challenge their reliance on the informants' information, defendants have relinquished the right to use that information for their own benefit at trial.

Finally, the Court rejects the defendants' argument that because Manning could have tried to show that his need for the informants' identities outweighed the interest in confidentiality – and "still could," the defendants argue in a brief filed *after the close of fact discovery, see* Def. Resp. (filed Oct. 15, 2004) at 1 – he should be prevented from seeking to bar the use of the informants' information. Manning *did* make that very argument, and the defendants persuaded the Court that he was wrong. The defendants surely were aware of the possible consequences of their successful assertion of the privilege, *see* Transcript of July 8, 2004 at 29-30, and now that they have succeeded, they must bear those consequences. Reversal of the Court's ruling after defendants suggested, on October 15, that Manning try again would have required an extended continuance of the trial, a course that the defendants are not free to dictate by requiring Manning to try again after he lost the first time.

Even if the evidence from the unnamed informants were not subject to exclusion as a matter of privilege law, and even if (as the defendants erroneously contend) the privilege had been asserted only by the government, the Court still would preclude defendants from relying on

20

information from sources whose identity they have chosen to protect. Manning argues in the alternative that admission of this information is barred by Federal Rule of Evidence 403. Under that Rule, the Court may exclude relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice" or various other factors. Fed. R. Evid. 403.

The information provided by the confidential sources may have probative value, but that value is nowhere near as high as the defendants claim. The defendants argue, in another context, that to determine the reasonableness of the defendants' actions, the jury "must evaluate the defendants' conduct in light of what the defendants knew at the time" of the events at issue, even if that involves wrongdoing by the plaintiff. *Geitz v. Lindsey*, 893 F.2d 148, 151 (7th Cir. 1990). But what it appears defendants propose to do is to display before the jury the entirety of the informants' information and then step back and say that "all of this information was out there" and *a fortiori* justified their decision to place Dye in a cell with Manning, their reliance on the veracity of Dye's account of his conversations with Manning, and other acts at issue in the case. There has to be more to it than that. Without some showing – a showing that the defendants have made no effort to support by any evidence in the extensive record – that the defendants actually took the informants' accusations into account in taking a particular action, the probative value of the evidence is not terribly great. In addition, as Manning points out, there are other factors that adversely affect the probative value of the informants' accusations: they were in significant part uncorroborated, and none of them led to prosecution of Manning.

Finally, and perhaps most importantly, exclusion of the matters as to which the defendants successfully resisted discovery *will not* preclude them from offering in evidence significant matters, equally prejudicial to Manning (though not unfairly so), that they say

21

contributed to their decision making process: among other things, information from Curtis Stover regarding Manning's intention to harm witnesses; Anthony Mammolito's accusation that he, Manning, and others had kidnapped persons to carry out an extortion scheme; the fact that Manning was under indictment for those very kidnappings; the contention, made by informants (and perhaps others) that Manning had been involved in the murder of Thomas McKillip; and Manning's prior convictions. Viewed in the context of the evidence as a whole, the defendants' purported, and at this point unsupported, reliance on the confidential informants' accusations has some probative value, but not much.

The other side of the balance tips strongly against admission of the evidence. There is a distinct danger that if the Court allowed in evidence the informants' claims that Manning was involved in as many as eight uncharged crimes, including several murders, the jury would unfairly disregard its obligations and find against Manning on the issue of liability based on improper grounds. But the more significant reason why the prejudice would be unfair is the one we discussed earlier: the fact that Manning, as the result of the successful privilege claim, has been hamstrung in attempting to refute the defendants' claim of reliance on the informants' information. The prejudice in this regard is no less unfair to Manning even if we were to adopt the defendants' fiction that it was only the government, not the individual defendants, that asserted the privilege. Unfair prejudice under Rule 403 does not depend on the fault of the opposing party.

For these reasons, the Court grants Manning's motion to impose negative evidentiary consequences, as well as his request under Rule 403 to preclude the defendants from relying on claims of criminality made by unnamed confidential informants as explaining or justifying their

22

challenged conduct.

**G.     Plaintiff's motions *in limine***

1, 2 & 3.     In his first three motions *in limine,* Manning seeks to preclude the

defendants from offering evidence of his use of physical violence in 1983 on his then girlfriend,

Marlies Vukelich; his juvenile arrests; and his former convictions.[5]  Defendants argue that all of

this evidence is part of the constellation of information that they relied upon in taking the actions

that Manning challenges in this case.  Unlike the information from the unnamed informants,

Manning is not hindered by any actions of the defendants, or otherwise, in attacking any claim of

reliance on this information.

Assuming the defendants can establish a nexus, that is, that they took the particular

information into account in taking some action that is placed at issue by way of Manning's

claims, this evidence is admissible. *See generally Geitz,* 893 F.2d at 151.  The Court cautions

defendants, however, that absent *evidence* – such as testimony by one of the law enforcement

officers whose conduct is challenged – tending to establish such a nexus, these earlier bad acts

will be inadmissible for any substantive purpose.  Without such a nexus, the evidence would not

be relevant and would be highly and unfairly prejudicial; defendants are not entitled to spread all

of the bad information about Manning on the record simply because it was "out there" at some

point in time.  Because of the danger of unfair prejudice to Manning if the prior bad acts are

referenced before the jury but the necessary nexus is never shown, the Court will expect defense

counsel to make an offer of proof satisfactory to the Court, outside the presence of the jury,

---

[5]  Manning's argument on the former convictions is that they cannot be used under
Federal Rule of Evidence 609 to impeach his credibility; in response, defendants argue that at
least some of the convictions are admissible for other reasons.

before they mention or elicit evidence of these prior bad acts at trial.

Defendants also argue that Manning's 1983 convictions, apparently for official misconduct and some unidentified criminal offenses relating to stolen automobiles, involved dishonesty and thus are admissible. Because more than ten years have elapsed since the dates of conviction and Manning's release from confinement, the convictions are inadmissible under Federal Rule of Evidence 609(b) unless the probative value of the particular conviction, "supported by specific facts and circumstances," substantially outweighs its prejudicial effect. Fed. R. Evid. 609(b). Defendants have not provided the Court with sufficient information about the particulars of the convictions to permit the Court to conduct the necessary balancing. If defendants actually wish to use the 1983 convictions for impeachment purposes, they must provide this supporting information before Manning takes the witness stand.

### 4. Information regarding a prosecutor

In 1982, around the time Manning was indicted in the previously mentioned official misconduct case, a search warrant for his apartment was executed, and a phonebook was found that contained the addresses of one of the prosecutors and the prosecutor's parents. Manning was confronted with this evidence at his deposition in the present case and stated that he was researching the background of the people who were prosecuting him; he denied any nefarious motive. This evidence was brought up at Manning's capital sentencing hearing in his Illinois murder case.

Manning contends that admission of this evidence in the present case would be unfairly prejudicial, as it would suggest his dangerousness. The Court does not perceive this prejudice as unfair and thus rejects Manning's Rule 403 argument. But as with the evidence discussed in the

previous section, unless the defendants can provide a nexus regarding their purported reliance on this information, it will be irrelevant and therefore inadmissible under Rule 402. The same offer-of-proof requirement established in the preceding section will apply to this evidence.

### 5. References to Justice Patrick Quinn

One of the prosecutors in Manning's Illinois case, Patrick Quinn, is now an Illinois Appellate Court justice. Justice Quinn will apparently be called to testify by the defendants at trial. Manning seeks to bar mention of the fact that he is a judge. The Court denies the motion. Defendants may elicit from Justice Quinn how he is currently employed, just as they would any other witness. But that is all: defendants may not dwell on the point and are not to address Justice Quinn as "Justice" or "judge" when questioning him. Defendants are also precluded from attempting, in testimony or argument, to draw an express or implied inference that the fact Justice Quinn now sits on the bench lends credibility to the prosecution of Manning in state court. In their response to Manning's motions *in limine,* defendants have hinted that this is exactly what they hope will occur; they say that the jury should hear that Quinn's "career did not founder after the Manning prosecution." Def. Resp. at 3. That would be an unfair inference. It is unlikely – and defendants have offered no evidence – that Justice Quinn's participation in the Manning case had anything whatsoever to do with his elevation to the bench.

### 6. Phone threat received by Missouri prosecutor

Manning seeks to bar evidence that in 1991, one of the prosecutors in Manning's Missouri kidnapping case received a threatening phone message, to the effect that, "Rex, you're a f------ stat." The former prosecutor, when deposed in this case, disclaimed any basis to believe that Manning was responsible for the threat, and defendants have offered nothing to support such

a claim. The motion is granted. The evidence is irrelevant, and even if it somehow might be considered relevant, its minuscule probative value is far outweighed by the risk of unfair prejudice to Manning.

### 7. Lost police badge found in the possession of Gary Engel

The defendants claim that when arrested in 1985, Gary Engel, later a co-defendant of Manning in the Missouri kidnapping case and a likely witness at trial, was found in possession of a police badge formerly belonging to Manning that Manning had reported was lost. Manning moves to exclude evidence regarding the badge. The Court denies the motion. The Court does not agree with defendants' contention that evidence regarding the badge is admissible to establish Manning's lack of credibility in the making of the report it was lost; under Federal Rule of Evidence 608(b), extrinsic evidence (such as evidence the badge turned up with Engel) is inadmissible to prove specific instances of misconduct to show a witness' untruthfulness. But the Court agrees with defendants that the badge is properly admissible to show the relationship between Manning and Engel, and that admission of the evidence would not unfairly prejudice Manning.

### 8. Joyce Pellegrino hearsay statement

Manning was tried in Illinois for murdering James Pellegrino. Joyce Pellegrino, James' wife, told the FBI at some point that around a month before he died, James told her that if he turned up missing, she should "tell the FBI the name Steve Manning." Later, after further interviews, Mrs. Pellegrino stated that James had made the statement on the very day he was killed. In her original interviews with the authorities after reporting her husband missing, Mrs. Pellegrino had made no mention of any such statement, or of Manning.

26

The Court agrees with Manning that James Pellegrino's statement is inadmissible hearsay if offered to prove the truth of the matter asserted. The erroneous admission of this statement at Manning's murder trial was part of the reason why the Illinois Supreme Court overturned his conviction. *See People v. Manning,* 182 Ill. 2d 193, 215-18, 695 N.E.2d 423, 433-34 (1998). The Court finds the Illinois Supreme Court's analysis persuasive. Any differences between Illinois' common law hearsay rule in this regard and Federal Rule of Evidence 803(3), relied upon by the defendants here, are immaterial.

Defendants appear to argue that James Pellegrino's purported statement is admissible for a non-hearsay purpose, specifically, to show their reason for taking some action that is at issue in this case. *See* Def. Resp. at 5. As with the evidence discussed earlier, defendants will not be permitted to mention or adduce evidence of the statement for their proposed non-hearsay purpose unless they first make an offer of proof that they will be able to provide admissible evidence of a nexus between the statement and some action the defendants took that is at issue in this case. The Court will leave it to Manning, with this and other evidence adduced regarding defendants' reliance on hearsay concerning of his alleged bad acts, to propose a limiting instruction to be given to the jury.

Manning offers another reason for excluding this evidence. He states, and defendants do not dispute, that defendants did not produce Mrs. Pellegrino's out-of-state address to Manning until September 20, 2004, just ten days before the close of fact discovery. This did not give Manning sufficient time to attempt to subpoena Mrs. Pellegrino for a deposition. Though some time remained for expert discovery after the close of fact discovery, the time was short – just a little over two weeks – and counsel's attention and efforts were fully occupied during that period

with the completion of expert discovery. In response, defendants argue that "[w]e did not provide [Mrs. Pellegrino's address] sooner because [Manning] did not request it." Def. Resp. at 5.

Under Federal Rule of Civil Procedure 26(a)(1), defendants were required, "without awaiting a discovery request," to provide the name and, if known, the address and telephone number of anyone "likely to have discoverable information that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1). It is not clear whether Mrs. Pellegrino would fall within this category – our sense is that the defendants propose to introduce James' statement to Mrs. Pellegrino via one of the defendants or another law enforcement agent, not via Mrs. Pellegrino herself – but in any event Manning does not rely on Rule 26(a)(1). Instead, he relies on interrogatories he served on the defendants. The Court does not see a particular discovery request that called on the defendants to produce the addresses of persons like Mrs. Pellegrino. The Court therefore rejects Manning's late-disclosure argument.

### 9. Mistaken reference to allegation of threat to Joyce Pellegrino

Manning moves to bar one of defendants' expert witnesses, Michael Zopf, from making reference to a purported threat by Manning to Joyce Pellegrino. Defendants concede the reference was mistaken; there was no such threat. Manning's motion is granted. Defendants are directed to instruct to avoid making reference to this matter.

### 10. Barring claim that Manning was a suspect in the English murder

Dye claimed Manning told him he had murdered Chuckie English in Elmwood Park in 1985. Defendant Miller testified at Manning's murder trial that Manning "is a suspect" in that murder (not, as Manning contends, that he "had been" a suspect). Manning states that the

Elmwood Park police department's records of the investigation do not include any mention of Manning. Presumably that would not rule out the possibility that the *FBI* considered Manning a suspect in the murder, at least after Dye said Manning had implicated himself. But Manning wants a "judicial finding" that the FBI's files would have corroborated that Manning was not a suspect. His basis for this request is his contention that the defendants declined to produce their file on the English matter after Manning requested it in a letter dated July 19, 2004. *See* Pl. Ex. K. Though defendants claim they "fully responded to the discovery served by Manning in this case," *see* Def. Resp. at 5, the Court sees no evidence they responded to the English request other than by ignoring it.

Manning also points to another series of events regarding the English matter that he contends puts him at an unfair disadvantage due to an apparent shift of position by the defendants. Manning served on the defendants interrogatories asking whether it was their position that he had murdered English, and asking for a summary of any evidence supporting their position. The government initially objected, saying "whether plaintiff committed the murder of Chuckie English is not at issue in the case," and the individual defendants disclaimed having any position on the matter. Manning also served a request for all documents relating to the English murder, but defendants objected on relevance grounds.

Manning moved to compel answers to the interrogatories and document requests. At the hearing on the motion, defendants' counsel stated, without hedging, that "[w]e have told him [Manning's counsel] we are not contending that Mr. Manning committed the murder of Chuckie English." Pl. Ex. J (Transcript of July 6, 2004) at 24. The Court went on to inquire, "is somebody on the defense side of the case going to stand up in front of the jury and say, he did it,

or we think he did it, or there is reason to believe that he did it, or some reasonable facsimile of that?" *Id.* at 25. Defendants' counsel gave a similarly unequivocal response: "I can give a straight answer to that without any problem. No." *Id.*

The Court thus proposed that Manning serve an amended interrogatory calling for this same information. *Id.* Manning took a slightly different tack, serving requests to admit. One of those was indistinguishable from what the Court had inquired:

> 3.     You will not take any position at trial suggesting that Mr. Manning may have actually murdered Mr. English, nor will any witness on your behalf.

Astonishingly, defendants' counsel who signed the response stated the opposite of what he had said in court just ten days earlier:

> RESPONSE:  Denied. Based on the evidence we have seen to this point, it is our position that Manning may have actually murdered Mr. English.

Pl. Ex. J. That is not cricket. Defendants will be held to the representation their counsel made before the Court, and on which the Court expressly relied in denying that aspect of Manning's motion to compel. Defendants are barred from contending at trial that Manning committed the murder of English. This does not preclude them, of course, from offering evidence of Dye's claim that Manning admitted involvement in the murder. But defendants will be precluded from testifying that Manning was an actual "suspect" beyond what Dye claimed Manning had said – as there is no evidence the primary investigating agency (Elmwood Park) considered him as such, and defendants refused to produce any records the FBI had bearing on the English murder. Nor will defendants be permitted to claim that any records the FIB had, other than the records memorializing Manning's purported statement to Dye, indicated that Manning was a suspect. Manning's motion is therefore granted to this extent.

### 11. References to families or personal information

The Court overrules Manning's request to bar the defendants from referring, as background, to the fact that they have families and children.

### 12. Witness security program payments to Dye

On July 7, 2004, over defendants' objection, the Court directed the defendants to produce "generic information regarding the types of benefits provided to Dye, and with regard to monetary benefits, the disclosure must include the amounts." *See* Order of July 7, 2004. Defendants did not produce this information until September 16, 2004, nearly two and one-half months later, and only two weeks before the close of fact discovery. Manning served additional interrogatories, document requests, and request to admit, in letter form, on September 17, 2004, but these were served too late, as there was insufficient time before the close of discovery for defendants to answer them (as defendants promptly advised Manning). *See* N.D. Ill. Local Rules, App. A ("Standing Pretrial Procedure Order and Forms"), ¶ 4.

Manning wants to bar the defendants from suggesting that the $30,000+ benefits provided to Dye were anything other than cash payments (as Dye testified at his deposition). The request, in that form, is denied. But the Court imposed limitations on the discovery of the witness security program information following, and based upon, defendants' objection to production of any information about the program at all. For this reason, defendants will be precluded at trial from offering direct evidence regarding the details of the benefits provided to Dye beyond what they produced during discovery.[6]

---

[6] The possible exception to this is discussed later in this Memorandum Opinion with regard to Manning's request to bar William Monroe from testifying as a defense witness.

### 13. Argument that the amount of payments to Dye was within a normal range

Manning wants to bar defendants from arguing that the witness protection program benefits that Manning received were within a normal range. The basis for this request is defendants' redaction of all information from their disclosures about the program as to what constitute normal assistance. *See* Pl. Ex. P. Defendants make no separate response to this request, other than (by implication) their argument that these benefits are irrelevant – an argument we have rejected. *See* Def. Resp. at 7. Manning's motion is granted. Defendants cannot withhold during discovery information about normal ranges of benefits and then claim at trial that the benefits provided were normal.

### 14. Evidence regarding a methamphetamine investigation in Cincinnati

Defendants do not object to Manning's request to bar mention of a supposed claim that Manning might have been involved in methamphetamine distribution in Cincinnati at some unspecified time. Though defendants have "reserve[d] the right to change their position," *see* Def. Resp. at 8, they may not seek to introduce such evidence without first obtaining leave of Court, outside the presence of the jury.

### 15. Manning's failure to file tax returns

Manning asks to bar the defendants from eliciting evidence that he failed to file tax returns in certain years. Defendants argue that the evidence may be relevant to damages, but they do not explain their theory of admissibility. If defendants intend to question Manning about this, they must advise the Court before he testifies on direct, and must provide the Court with basis on which they claim this evidence is admissible.

**16 & 17.**      **Manning's suspensions as a police officer and search of storage locker**

The Court will permit defendants to offer evidence that Manning was suspended from the Chicago police department and then left the department following his indictment for official misconduct, and evidence regarding incriminating items found in his storage locker, so long as they can lay a foundation for the type of "nexus" discussed with regard to Manning's motions *in limine* 1, 2, and 3 – that is, to the effect they actually considered this information in relation to some action that is at issue in this case. Defendants will be expected to make an offer of proof of the type discussed earlier before mentioning or adducing evidence about these matters.

**18.**      **Manning / Dye false alibi plan**

The tape recorded conversations between Dye and Manning included what the defendants characterize as discussions of a plan between Manning and Dye whereby Manning would arrange to have the witnesses against Dye killed in exchange for help in creating a false alibi for the Missouri kidnapping case. Manning's request to bar this evidence is denied.

The Eighth Circuit held that the use of an informant to obtain incriminating information from Manning in the Missouri case after he was under indictment and represented by counsel violated his Sixth Amendment right to counsel. *Manning v. Bowersox,* 310 F.3d 571, 576 (8th Cir. 2002). And under *Maine v. Moulton,* 474 U.S. 159, 174 (1985), and *United States v. Henry,* 447 U.S. 264 (1980), it was the elicitation of this information, not just its use at trial, that violated Manning's right to counsel. *See Henry,* 447 U.S. at 264 ("By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel.") (footnote omitted).

Manning asks to bar this evidence based not on the Sixth Amendment violation, but on the grounds it is irrelevant and unfairly prejudicial. The Court disagrees. The evidence is conceivably relevant to put in context Manning's purported admission to the Pellegrino murder, and may also be relevant for the purpose of explaining defendants' actions, at least so long as they can show a nexus of the type and in the manner discussed earlier in this Memorandum Opinion. Though Manning argues that the conversations do not have the import that the defendants claim, that is a matter of interpretation that is appropriately left to the fact finder at trial. Assuming defendants can establish the appropriate nexus, the evidence is relevant and not unfairly prejudicial.

### 19.    Testimony of AUSA Canella Henrichs

Manning has moved to bar the testimony of AUSA Henrichs on the ground that defendants precluded inquiry of Henrichs on numerous topics by asserting the attorney-client and work product privileges and also withheld numerous documents Henrichs had authored or reviewed on similar grounds. The Court has previously held that the attorney-client privilege was expressly waived by the government with regard to Henrichs' concurrence in the decision to record conversations between Dye and Manning, and that Manning was not precluded from inquiring of Henrichs in this area. Manning's request is thus denied to the extent he seeks to bar Henrichs from testifying about her decision to concur. Henrichs will, however, be precluded from testifying about obtaining the approval of her supervisors within the United States Attorney's Office, as the government declined to waive the work product privilege as it related to such communications.

At the hearing on the motions *in limine,* however, defendants indicated that they intended

to elicit testimony from Henrichs about subjects beyond her concurrence in the recording of Manning. Defense counsel's description of the subjects, however, was somewhat vague, and the Court does not have a clear sense of what defendants propose to elicit. Absent extraordinary circumstances, defendants will not be permitted to elicit testimony from Henrichs regarding any matter on which they claimed privilege; as discussed earlier, they cannot use the privilege to shield information and then use that same information, or aspects of it, as a sword. So that the Court can effectively monitor this area of testimony, defendants are directed to provide the Court and Manning, by the outset of the trial, a privilege log that provides a more meaningful identification of the subject matter of the documents withheld than the bare-bones privilege log that was produced in court.[7] And they must have available in the courtroom, for the Court's review if necessary, all Henrichs-related documents that they withheld on privilege grounds.

## 20. Tape recording of Gary Engel

Manning asks the Court to exclude a tape recorded conversation between Gary Engel and Sharon Dugan, Engel's ex-wife and James Pellegrino's sister. In that conversation, Engel stated, among other things, that on the day Pellegrino disappeared, Pellegrino told Engel he was going to see manning, and later called Engel to say he was waiting for Manning, and then that Manning had arrived. This, supposedly, was the last anyone heard from Pellegrino.

Manning moves to bar the evidence, first, on the ground that it was obtained in violation of Illinois' anti-eavesdropping law, which requires (with certain exceptions) both parties to

---

[7] The log that defendants provided plainly did not comply with Federal Rule of Civil Procedure 26(a)(5)'s requirement that a privilege log "describe the nature of the ... things not produced or disclosed in a manner that, without revealing information itself privileged or protected, *will enable other parties to assess the applicability of the privilege or protection.*" Fed. R. Civ. P. 26(a)(5) (emphasis added).

consent to the recording of a conversation. *See* 720 ILCS 5/14-2. But federal law requires the consent of only one party, *see* 18 U.S.C. § 2511(2)(c), and defendant Buchan had Dugan's consent. The Illinois statute does not control admissibility in federal court, at least as to claims made under federal law, like Manning's *Bivens* and RICO claims. *See, e.g., NLRB v. Local 90, Operative Plasterers and Cement Masons' Int'l Ass'n*, 606 F.2d 189, 192 (7th Cir. 1979). There is authority that the Illinois statute bars use of such evidence on claims under Illinois law, *see, e.g., Fenje v. Feld*, 301 F. Supp. 2d 781, 817 (N.D. Ill. 2003), but in this case the only claim that might somehow be regarded as an "Illinois law" claim is the Federal Tort Claims Act against the government: the FTCA holds the government liable "in the same manner and to the same extent as a private individual under like circumstances" and provides that the law of the state where the challenged act or omission occurred governs. *See* 28 U.S.C. §§ 1346(b)(1), 2674. The parties have not addressed whether this might make the FTCA claims state law claims for purposes of the applicability of the Illinois eavesdropping statute. But because the FTCA claim is for the Court to decide, not the jury, we need not finally resolve that issue now. For the present it suffices that the tapes are not barred by the Illinois statute on the claims the jury will decide.

Manning also argues that Engel's statements are inadmissible hearsay. They would be, if offered to prove the truth of what Engel asserted; in addition, Engel's expression to Dugan of his surmise that Manning committed the murder would be inadmissible on relevance grounds. But defendants appear to offer the information for a non-hearsay purpose. They argue that "it is proper for defendants to present evidence about the investigation they conducted and the information that they received." Def. Resp. at 11. This statement is a bit hard to comprehend, and it appears to the Court to sweep far too broadly. If defendants are saying they relied in some

way on Engel's statements into taking some action that is challenged in this case, they will be required to show evidence of a nexus, as discussed earlier, via an offer of proof before mentioning or adducing the evidence. If defendants have some other non-hearsay theory of admissibility, they need to explain it, clearly, succinctly, and directly – which they have not done thus far – as well as promptly.

### 21. Engel's arrests, convictions, and uncharged bad acts

The Court grants Manning's request to exclude evidence of Gary Engel's arrests that did not result in criminal charges, his convictions that are more than ten years old, and other uncharged bad acts. Defendants have made no effort to set forth a proper basis for admissibility of this information. They make the bare, unsupported, and unexplained claim that "Engel's background is relevant to the defendants' investigation." Def. Resp. at 12. Without more, this is insufficient, and defendants make no attempt to claim, not even in bare-bones fashion, that information about Engel was something they relied on in taking the actions against Manning that are challenged in this case.

### 22. Federal RICO investigation

Defendants state that they "do not need or now intend to introduce any details" of a purported RICO investigation of Manning that he asks the Court to bar. Though they hedge this a bit in a single sentence that states, without elaboration, that "[m]atters which were conveyed to [defendants] were provided in discovery and are relevant and admissible," *see* Def. Resp. at 12, that appears to involve something different from what Manning challenges, which were matters that evidently did not make it into the Manning investigatory file with which Buchan and Miller were involved. *See* Pl. Mot. *In Limine* at 24. Manning's motion is therefore granted.

### 23. Accusations raised at Manning's sentencing hearing

Manning seeks to preclude the defendants from offering a "laundry list" of accusations of various crimes that were advanced at his capital sentencing proceeding. Defendants contend this information is relevant to establish the reasonableness of their actions. Perhaps so, but defendants have made no effort to establish a nexus between their purported knowledge of these allegations and any particular action they took that is challenged in this case. And there is a more significant problem. It appears, based on what the parties have advised, that the basis for the accusations that are the subject of this motion is documentation that the defendants either declined to produce in discovery, or that consisted of information from unidentified informants. Defendants are barred from introducing any such allegations for the reasons previously discussed. If there are matters referenced at Manning's sentencing hearing that were not the product of information withheld in discovery, defendants may be able to offer them in evidence, but only following the making of an offer of proof showing that they can establish a nexus between their knowledge of the allegations and some decision or action that is challenged in this case.

### 24. Uncharged crimes

Manning seeks to bar evidence of uncharged crimes of which he was allegedly accused or suspected. It appears to the Court that this topic has been covered by the Court's rulings regarding admissibility of information from confidential informants, or evidence of other uncharged crimes. If there is something the Court has missed, the parties should bring it to our attention promptly.

### 25. Information obtained from confidential informants

This issue was dealt with in Section F of this Memorandum Opinion.

### 26. Prior convictions of Manning's witnesses

The Court denies Manning's request to bar the defendants from using, to impeach Manning's witnesses, any prior convictions that were not disclosed in response to an interrogatory addressing the point. Defendants may use any convictions admissible for this purpose under Federal Rule of Evidence 609 that were disclosed in response to the interrogatory, as well as those that were otherwise made known to Manning during discovery, specifically, at the depositions of the witnesses in question.

### 27. Evidence regarding the McKillip murder

Though Manning concedes that defendants may introduce evidence of information they had at relevant times regarding his purported involvement in the murder of Thomas McKillip, he seeks to bar them from using at trial after-acquired information to attempt to prove Manning's guilt of the murder. The Court agrees with defendants that they may introduce information that came to their attention during the course of the investigation that ultimately led to the Missouri prosecution; such information is relevant because, as defendants argue, it will provide a context for certain actions that are challenged in this case.

Defendants appear also to contend, however, that they can go beyond this and offer additional evidence or information that was learned or that came to their attention at later times. The Court does not see the relevance of this, and defendants have made no effort to describe it, other than by way of an unexplained statement that such evidence "put[s] defendants' actions in context and allow[s] defendants to explain their actions." Def. Resp. at 14. Such generalities do

not suffice to establish the relevance of the evidence under Federal Rule of Evidence 402 or its probative value so that the Court can conduct a Rule 403 analysis. Thus, if defendants wish to offer this after-acquired evidence for some purpose, they must follow the same offer of proof requirement previously discussed to show they can establish a nexus between this highly and potentially prejudicial information and some action or decision of theirs that is under attack.

### 28.    Allegedly undisclosed witnesses

Manning contends his counsel asked the defendants repeatedly to identify who they would call to testify at trial, stating that he wished to take the depositions of any such persons while discovery remained ongoing. He argues that the defendants' witness list provided as part of the proposed final pretrial order includes persons who were "never disclosed and/or made available for deposition" and thus should not be allowed to testify. Pl. Suppl. Mot. *In Limine* at 3.

The record reflects that Manning never served on defendants an interrogatory seeking a list of trial witnesses. Rather, he served an interrogatory seeking identification of persons with knowledge of relevant facts. When Manning's counsel had the communications with defense counsel referenced above, he relied on that interrogatory, interpreting it as asking for a list of trial witnesses. But that is not what the interrogatory said, and defense counsel made it clear he disagreed. Manning did not serve a revised interrogatory after defense counsel's position was made known.

Manning's real complaint appears to be that defendants' identification of persons with knowledge incorporated *en masse* any persons identified in the enormous volume of material produced in discovery. Manning has a fair point when he says this was unfair in the particular

circumstances of this case. But the appropriate remedy for this problem would have been a request for a more particularized answer or, as noted earlier, a revised interrogatory. Waiting until after the end of discovery and then asking the Court to strike anyone who was not named specifically is not a fair or appropriate remedy under the present circumstances.

There is one witness disclosed in this manner who may fall in a different category. Manning asked for the deposition of First Assistant United States Attorney Gary Shapiro,[8] and a letter from Manning's counsel to defendants' counsel dated July 15, 2004 reflected an agreement that defendants' counsel would produce Shapiro for a deposition during the week of August 2. *See* Pl. Ex. Z. Defendants contend that "[p]laintiff chose to pass on that deposition," *see* Def. Resp. at 16, but they do not support that contention. Manning contends that after Dye's deposition, defendants' counsel indicated he might call Shapiro to testify to rebut something Dye had said. Manning promptly renewed his request to depose Shapiro by way of a letter dated October 26, 2004, *see* Pl. Ex. Z, but he says he heard nothing back from defendants' counsel. The Court will require more information on these questions before determining whether Shapiro may testify. Defendants arguably may be entitled to add witnesses as a result of unanticipated matters that came up at the belated deposition, but the Court is unlikely to permit them to do so if they have not made the new witnesses reasonably available for deposition.

There are two persons who defendants concede were not identified in any way until quite recently: Bill Sowers and William Monroe. Sowers is an investigator with a California prosecutor's office who defendants plan to call to rebut an allegation made by Dye in his

---

[8] The Court notes that despite defendants' contention that Shapiro was "listed *by name*" in the interrogatory answers cited in and attached to their response, *see* Def. Resp. at 16 (emphasis in original) & Ex. 3, the Court could not find Shapiro's name in those answers.

deposition, taken after the close of discovery by agreement of the parties, that he was prosecuted in California in supposed retaliation for his refusal to testify at any retrial of Manning on the Pellegrino murder. The real problem with this is that it is difficult to see how Dye's belief constitutes admissible evidence to begin with; the Court cannot imagine what personal knowledge or admissible evidence Dye can contribute. The appropriate way to deal with Dye's statement is to seek to exclude it, not add an undisclosed witness to the list. The Court bars Sowers from testifying, though we will reconsider this ruling if it can be shown that Dye's belief about the California prosecution is admissible.

The second witness is William Monroe, an FBI agent who will be called to rebut a statement by Dye that he received in witness security program payments $2,000 more than is documented in discovery. According to the defendants, Monroe "will testify about what FBI records show about payments to Dye." Def. Resp. at 15. Standing alone, Dye's late-breaking testimony on this point likely would warrant permitting defendants to add Monroe to their witness list. But there is another problem. As discussed earlier, defendants resisted discovery of any witness security program information, and based on their confidentiality concerns the Court was persuaded to impose severe limits on what had to be disclosed regarding the witness security program payments. Defendants now offer to "provide Manning with discovery of what [Monroe] finds prior to trial." *Id.* The Court reserves ruling on whether Monroe can testify pending the making of these disclosures, and cautions the government that if it continues to limit the scope of discovery regarding the payments, the Court likely will look unfavorably on the request to call Monroe.

Manning also asks the Court to bar the testimony of Judge Edward Fiala, who presided

42

over Manning's Illinois trial, arguing he has no relevant evidence. Defendants have not replied. This matter should be taken up before Judge Fiala, a trial judge who presides over an extremely busy docket in the Criminal Court, is brought in to testify.

### 29.   Defendants' exhibit list

Defendants' exhibit list does not conform to the requirements of the Court's standing pretrial order rules. Defendants have identified *en masse* what appears to be the entirety of several FBI and Buffalo Grove investigatory files, as well as the entirety of voluminous prison and employment files. The Buffalo Grove files alone consist of over 3,800 pages.

This Court's standing pretrial order rules require identification of "all exhibits a party may introduce at trial." *See* www.ilnd.uscourts.gov/judge/kennelly/fptd.pdf, ¶ 7. This requirement has the purpose of, among other things, avoiding unfair surprise at trial and permitting the opposing party to make objections so that issues of admissibility can be addressed in a manner that will not disrupt the flow of the trial or unduly impose on the jury. As Manning correctly notes, defendants listing of the bulk exhibits "leaves Plaintiff without any ability to meaningfully challenge references to any particular document." Pl. Supp. Mot. *In Limine* at 7.[9] Because of their non-compliance with the Court's requirements, defendants will be barred, absent extraordinary circumstances, from introducing in evidence any document that has not been identified *with particularity* in an amended exhibit list to be provided by no later than the end of jury selection on December 6.

---

[9] It is conceivable that defendants actually intend to introduce the files *en masse*. The Court seriously doubts, however, whether the files are admissible in that manner. And we are rather certain that would not be a productive way to place information before the jury.

**30.    Evidence on "antisocial personality disorder"**

Manning has moved to bar defendants' damages expert from offering testimony that Manning might have "antisocial personality disorder." This motion was filed later than the other motions *in limine* because of the timing of the submission of damages expert reports. As a result, defendants have not yet had an opportunity to respond. Until they have done so and the Court has ruled, defendants should not mention or elicit testimony on this point.

## Conclusion

For the reasons stated above, the Court grants Manning's motion to impose negative evidentiary consequences [# 114-1]; denies Manning's fourth motion to compel [# 167-1]; grants in part and denies in part Manning's and defendants' motions *in limine* [# 171-1, 172-1, 173-1 & 2]; denies Manning's motion to reconsider [# 177-1] and his motion for leave to file amended complaint [# 180-1]; and defers ruling on Manning's motion *in limine* regarding evidence of "antisocial personality disorder" [# 184-1]. The motion for leave to file an additional appearance [# 169-1] was previously granted and is therefore terminated. The case is held for a combined jury/bench trial on December 6, 2004 at 9:45 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   December 3, 2004

44